**Supreme Court**

No. 2013-89-Appeal.
(PC 08-5961)

Kevin R. Hough                     :

v.                     :

Shawn P. McKiernan et al.                     :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Kevin R. Hough                    :

v.                                :

Shawn P. McKiernan et al.         :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.** Kevin R. Hough (plaintiff) was severely injured when he was punched by Shawn P. McKiernan, the force of the blow causing Hough to fall backwards and strike his head on the pavement of a street. Immediately prior to this incident, McKiernan had driven by Hough on several occasions in an automobile owned by one Rita Bower, flashing the high beams and taunting Hough as he drove past.

Among the defendants sued by Hough was Quincy Mutual Fire Insurance Company (Quincy), the insurer of the vehicle driven by McKiernan. The plaintiff alleges liability under the provisions of G.L. 1956 § 31-33-6, which imputes vicarious liability upon the owner of a vehicle for its consensual use or operation.[1] Hough now appeals from a Superior Court judgment as a matter of law in favor of Quincy. The issue presented in this case concerns the liability of a motor vehicle owner, or her insurer, for injuries caused by the intentional act of a

---

[1]General Laws 1956 § 31-33-6 provides in pertinent part that:

> "Whenever any motor vehicle shall be used, operated, or caused to be operated upon any public highway of this state with the consent of the owner, lessee, or bailee, expressed or implied, the driver of it, if other than the owner, lessee, or bailee, shall in the case of an accident be deemed to be the agent of the owner, lessee, or bailee of the motor vehicle unless the driver shall have furnished proof of financial responsibility in the amount set forth in chapter 32 of this title, prior to the accident."

- 1 -

permissive driver, but which act occurred at a distance from the vehicle. Because we conclude that plaintiff has failed to demonstrate a causal connection between the vehicle and his injuries, we affirm the judgment of the Superior Court.

# I

## Facts and Procedural History

On the evening of February 22, 2006, McKiernan drove a black GMC Sonoma truck, owned by one of his parents, to a social gathering at the home of his friend, Brian Burke. The gathering that evening consisted of McKiernan, Burke, Krista Archer, Wade Berard, Brian Petabella, and Samantha Grasso. At one point during the evening, Grasso asked McKiernan for permission to borrow the GMC Sonoma truck to find her boyfriend, Mike Gauthier. McKiernan declined to give her permission.

Notwithstanding his refusal, Grasso found McKiernan's keys and took the truck without permission. Later, Archer allowed McKiernan to use her red Nissan Altima (the Bower or insured vehicle) to search for the truck. This vehicle was owned by Archer's grandmother, Rita Bower. Prior to trial, Quincy admitted that Bower, as the vehicle owner, gave permission to Archer for the regular use of the vehicle and specifically for its use on the evening of February 22 and early morning hours of February 23, 2006. Quincy also admitted that it insured the Bower vehicle on those dates.

McKiernan testified at trial that he thought he was insured on the date in question through an Allstate Indemnity Company (Allstate) automobile policy.[2] The Allstate policy listed his

---

[2] At trial, both parties stipulated to the fact that McKiernan was covered under an Allstate insurance policy issued in his father's name. Additionally, McKiernan admitted at trial that an attorney hired by his insurer, Allstate, was representing him in these proceedings. Notwithstanding the stipulation, plaintiff made clear that he did not concede that Quincy had satisfied its burden of proof to utilize the exemption under § 31-33-6.

father, Peter McKiernan, as the named insured and Shawn McKiernan was listed as a "driver" on the declarations page.

After departing his friend's house, McKiernan and his passengers (Archer, Burke, and Berard) drove through Warwick looking for Grasso and the missing truck. As they searched the streets, they came upon two people walking along Davidson Road. The two young men were Hough and Nicholas Messier. According to plaintiff's testimony, as the vehicle approached them, McKiernan rolled down his window and yelled "[v]arious obscenities" at them as the vehicle passed by. McKiernan testified that he considered his insults to be funny jokes about the boys' mothers that amused his laughing companions in the vehicle. McKiernan indicated in his testimony that he circled around and drove by plaintiff and Messier several times, hurling insults and flashing the high beams, as his passengers continued to "egg" him on.

McKiernan testified that, after such passages, he stopped the insured vehicle when he spotted his missing truck. He further testified that he waited some period of time, between five and ten minutes, before exiting the insured vehicle, while plaintiff and Messier talked to the people in his truck. Concerning the proximity of the insured vehicle in relation to Hough, plaintiff testified that McKiernan stopped the car "about two or three car lengths ahead of us." McKiernan testified that the car was "[t]hree or four car lengths" away from plaintiff and Messier. McKiernan also testified that, as he was sitting in the car, someone flicked a cigarette, which hit him in the face. Agitated and annoyed, McKiernan, along with Burke and Berard, jumped out of the car and chased Messier. McKiernan first shoved Messier, but then instead pursued Hough once Messier demonstrated that he was still holding his cigarette.

Turning his attention to plaintiff, McKiernan swung at him but plaintiff "ducked" thereby avoiding the blow. The plaintiff testified that he then stated, "I'm not going to fight you," but

McKiernan punched him in the chest anyway. According to McKiernan, plaintiff "stiffened up like a board and fell back" to the ground. While Hough lay on the pavement, one of McKiernan's friends "grabbed" him, told him to "get out of here," and put him in the insured vehicle.[3] Acknowledging that he "knew [he] was going to get caught," McKiernan testified that he fled the scene rather than render assistance to the young man he had just knocked to the ground.

As a result of the assault and battery, Hough suffered a serious head injury, a subdural hematoma. His treating physician removed a portion of his skull in order to relieve the pressure, thereby allowing his brain to swell and eventually heal. The portion of his skull that was removed was then implanted in his abdomen until it could be replaced in his skull. The plaintiff endured a long road to recovery with multiple surgical procedures and rehabilitation, including occupational, physical, and speech therapy.

On September 16, 2008, plaintiff filed suit against McKiernan alleging negligence, assault, and battery. Subsequently, plaintiff amended his complaint three times to add parties and allegations. In the first amended complaint, plaintiff added negligence claims against Phillip and Darlene Burke (parents of Brian Burke),[4] as well as Diane Archer (mother of Krista Archer).[5] In the second amended complaint, plaintiff added a negligence claim against Bower (grandmother of Krista Archer) as the vehicle owner, along with a Jane Doe negligence count

---

[3] Archer had already left in the GMC Sonoma truck.

[4] Summary judgment was granted in favor of the Burkes on August 23, 2012. Final judgment was entered for them on November 26, 2012.

[5] The plaintiff agreed to dismiss his complaint against Diane Archer just prior to trial, after Quincy admitted that the motor vehicle in question was owned by Bower, rather than Diane Archer. The Superior Court record reflects that a dismissal stipulation for Diane Archer was entered on December 3, 2013.

arising out of the vehicle ownership. Subsequently, due to the death of Bower, Quincy was substituted as a party defendant in place of its deceased insured pursuant to G.L. 1956 § 27-7-2.[6]

A jury trial commenced on November 28, 2012. At the conclusion of plaintiff's case, Quincy moved for judgment as a matter of law under Rule 50 of the Superior Court Rules of Civil Procedure. The trial justice granted the motion in favor of Quincy, determining that the owner-liability statute applied, but that Quincy, as the insurer of the vehicle owner, was exempt from liability on the basis that McKiernan had furnished proof of financial responsibility. Final judgment for Quincy was entered on November 30, 2012, and plaintiff filed a notice of appeal on December 18, 2012.[7] The trial against McKiernan proceeded on the sole issue of damages[8] and the jury returned a verdict awarding plaintiff $1.75 million.[9]

---

[6] General Laws 1956 § 27-7-2 provides in pertinent part:
> "An injured party, * * * in his or her suit against the insured, shall not join the insurer as a defendant. * * * [W]here before suit has been brought and probate proceedings have not been initiated the insured has died, or where a suit is pending against an insured in his or her own name and the insured died prior to judgment, * * * the injured party * * * may proceed directly against the insurer."

[7] The plaintiff's notice of appeal, filed on December 18, 2013, was premature because a final judgment had not yet been entered for all parties. See Mattera v. Mattera, 669 A.2d 538, 542 (R.I. 1996). This Court, however, will treat this notice of appeal as valid because a final judgment was entered thereafter. Miller v. Saunders, 80 A.3d 44, 47 n.8 (R.I. 2013).

[8] The trial justice instructed the jury: "Mr. McKiernan has admitted that he did assault the plaintiff. Accordingly, it is unnecessary for you to determine whether Mr. McKiernan is liable to Mr. Hough for assault, because it has been conclusively established that Mr. McKiernan is liable to Mr. Hough for the intentional tort of assault."

[9] The defendant timely filed a motion for a remittitur and/or a new trial. Over plaintiff's objection, the trial justice granted defendant's motion, ordering a new trial unless plaintiff agreed to a remittitur reducing his award of damages to $925,000. The plaintiff accepted the reduced award and accordingly, a new judgment was entered in favor of plaintiff for that amount, plus interest. McKiernan filed a timely notice of appeal from this judgment on January 3, 2013. This Court affirmed the judgment in the amount of $925,000. See Hough v. McKiernan, 101 A.3d 853 (R.I. 2014).

## II

## Standard of Review

"In reviewing a trial justice's decision on a motion for judgment as a matter of law, this Court is bound to follow the same rules and legal standards as govern the trial justice." Perry v. Alessi, 890 A.2d 463, 467 (R.I. 2006) (quoting Women's Development Corp. v. City of Central Falls, 764 A.2d 151, 157 (R.I. 2001)). The trial justice, and consequently this Court, must examine "the evidence in the light most favorable to the nonmoving party, without weighing the evidence or evaluating the credibility of witnesses, and draw[] from the record all reasonable inferences that support the position of the nonmoving party." Id. (quoting Women's Development Corp., 764 A.2d at 157). Ultimately, a trial justice should enter a judgment as a matter of law "when the evidence permits only one legitimate conclusion in regard to the outcome." Long v. Atlantic PBS, Inc., 681 A.2d 249, 252 (R.I. 1996).

In addition, "[t]his Court reviews questions of statutory construction and interpretation de novo." National Refrigeration, Inc. v. Capital Properties, Inc., 88 A.3d 1150, 1156 (R.I. 2014) (quoting Morel v. Napolitano, 64 A.3d 1176, 1179 (R.I. 2013)). It is well settled that "[w]hen the statutory language is clear and unambiguous, we give the words their plain and ordinary meaning." Id. (quoting Morel, 64 A.3d at 1179). This Court, however, must act as the "final arbiter of questions of statutory construction" when confronted with unclear or ambiguous statutory language. Tanner v. The Town Council of East Greenwich, 880 A.2d 784, 796 (R.I. 2005) (quoting Mottola v. Cirello, 789 A.2d 421, 423 (R.I. 2002)). "[O]ur interpretation of an ambiguous statute 'is grounded in policy considerations and we will not apply a statute in a manner that will defeat its underlying purpose.'" Town of Burrillville v. Pascoag Apartment Associates, LLC, 950 A.2d 435, 446 (R.I. 2008) (quoting Arnold v. Rhode Island Department of

Labor and Training Board of Review, 822 A.2d 164, 169 (R.I. 2003). Further, "[w]hen construing a statute, our ultimate goal is to give effect to the purpose of the act as intended by the Legislature." Mendes v. Factor, 41 A.3d 994, 1002 (R.I. 2012) (quoting Generation Realty, LLC v. Catanzaro, 21 A.3d 253, 259 (R.I. 2011)). Therefore, "[w]e must determin[e] and effectuat[e] that legislative intent and attribut[e] to the enactment the most consistent meaning." Id. (quoting Generation Realty, LLC, 21 A.3d at 259). "Finally, under no circumstances will this Court construe a statute to reach an absurd result." Id. (quoting Generation Realty, LLC, 21 A.3d at 259).

### III

### Discussion

On appeal, plaintiff argues that the trial justice erred in finding as a matter of law that Quincy, standing in the shoes of the vehicle owner, Bower, was shielded from liability under the exemption provided in § 31-33-6 for furnishing proof of financial responsibility. The plaintiff contends that Quincy failed to prove that McKiernan satisfied the statutory requirements necessary to avoid vicarious liability under the exemption. In addition, plaintiff asserts that there was a sufficient nexus between his injuries and the insured vehicle to warrant the application of § 31-33-6 and the imposition of liability on Quincy. The plaintiff also avers that Quincy can be held liable under the statute even if the vehicle owner owed no duty of care to plaintiff. Finally, plaintiff argues that McKiernan's battery did not constitute a superseding, intervening cause to cut off Quincy's liability.

Quincy argues that the trial justice was correct in ruling that the owner-liability statute, § 31-33-6, does not apply to the present case because McKiernan was independently insured under an automobile policy issued by Allstate. Further, Quincy argues that, even if the trial

justice erroneously determined that McKiernan satisfactorily furnished proof of financial responsibility, the trial justice's grant of judgment as a matter of law for Quincy was nevertheless proper. Quincy asserts that the ruling was proper because plaintiff's injuries did not result from an accident involving the insured motor vehicle.

Although plaintiff's arguments focus on the requisites for furnishing proof of financial responsibility, we must first determine if, as the trial justice concluded, the owner-liability statute applies to the facts of this case. Thus, we begin with the threshold issue of whether Quincy, as the insurer of the deceased vehicle owner, can be held vicariously liable pursuant to § 31-33-6 for McKiernan's intentional misconduct apart from the insured vehicle. The interpretation and application of statutory language lies at the heart of this dispute; it is our task, therefore, to delineate the scope of the term "accident" within § 31-33-6, the owner-liability statute.

At common law, an agency relationship between a vehicle owner and driver was necessary in order to hold the owner vicariously liable for acts of the driver. Kernan v. Webb, 50 R.I. 394, 398, 148 A. 186, 188 (1929).[10] "The enactment of § 31-33-6 abrogated this common law rule by statutorily extending the liability of an automobile owner to situations in which no common law agency relationship existed." Dias v. Cinquegrana, 727 A.2d 198, 199 (R.I. 1999). Section 31-33-6 provides in pertinent part:

> "Whenever any motor vehicle shall be used, operated, or caused to be operated upon any public highway of this state with the consent of the owner, lessee, or bailee, expressed or implied, the driver of it, if other than the owner, lessee, or bailee, shall in the case of an accident be deemed to be the agent of the owner, lessee, or bailee, of the motor vehicle unless the driver shall have furnished proof of financial responsibility in the amount set forth in chapter 32 of this title, prior to the accident." (Emphases added.)

---

[10] In Kernan v. Webb, 50 R.I. 394, 398, 148 A. 186, 188 (1929), this Court examined an earlier version of the owner-liability statute, § 31-33-6, first enacted as P.L. 1927, ch. 1040, § 3.

Specifically, § 31-33-6 holds a motor vehicle owner vicariously liable for the acts of another driver who drives with the owner's consent, often referred to as a permissive driver, unless that driver "furnished proof of financial responsibility" before the accident.[11]

We have had occasion to consider this statute, both in its present form and in its previous iterations, and we have established that "the manifest purpose of § 31-33-6 is to ensure that a victim of a car injury has an avenue of recovery." Dias, 727 A.2d at 199. The precise meaning of the term "accident" has perhaps been more elusive, but we have held that it encompasses intentional acts, "an interpretation that, of course, is a broad one, but one that we believe is consistent with the purpose of § 31-33-6, namely, to protect an innocent victim from having to shoulder the expense of an injury." Dias, 727 A.2d at 200.

Thus, in Dias, 727 A.2d at 199-200, we concluded that the statute applied to impose liability on the vehicle owner for the permissive driver's intentional act of striking the plaintiff's motorcycle with the insured motor vehicle. Our holding in Dias was consistent with the fundamental policy underlying § 31-33-6, namely, to protect innocent victims from bearing the burden of injury expense.

Consistently, and without departure, however, we have applied this statute only in cases where the driver's negligent or intentional use or manipulation of a motor vehicle precipitated an "accident," in which the insured vehicle caused a "car injury" to the victim. See, e.g., Black v. Vaiciulis, 934 A.2d 216, 217, 219-20 (R.I. 2007) (automobile collision involving insured vehicle driven by permissive driver); Delsanto v. Hyundai Motor Finance Co., 882 A.2d 561, 562-63

---

[11] This Court has previously established, in F. D. McKendall Lumber Co. v. Ramieri, 85 R.I. 92, 95-96, 126 A.2d 560, 561-62 (1956), that the owner-liability statute may impose liability on a vehicle owner for the acts of a second-tiered permissive driver, such as McKiernan. McKiernan was the second-tiered driver with permission because the insured vehicle was owned by Bower, who gave permission to her granddaughter, Archer, to use the vehicle on the night of the incident. Archer, then, gave permission to McKiernan to drive the insured vehicle that night.

- 9 -

(R.I. 2005) (same); <u>Oliveira v. Lombardi</u>, 794 A.2d 453, 455 (R.I. 2002) (motorcycle and motor vehicle accident); <u>Baker v. Rhode Island Ice Co.</u>, 72 R.I. 262, 263, 50 A.2d 618, 618 (1946) (automobile collision involving insured vehicle driven by permissive driver); <u>Landi v. Kirwin & Fletcher</u>, 52 R.I. 57, 58, 157 A. 301, 301 (1931) (automobile driven by permissive driver injured pedestrian).

Notwithstanding this Court's broad interpretation of "accident" in <u>Dias</u>, we do not read that opinion as extending a possible avenue of recovery to a person other than "a victim of a car injury." <u>Dias</u>, 727 A.2d at 199. Rather, we interpret § 31-33-6 as imposing vicarious liability upon the owner of a motor vehicle for the acts—intentional as well as unintentional—of anyone using or operating the vehicle with the consent of the owner. A plaintiff carries the burden, however, of establishing a causal relationship between the use of the vehicle and the injuries sustained by the plaintiff.

Here, plaintiff failed to establish such a causal connection. It is our opinion that the fact that McKiernan drove by plaintiff several times, flashing the high beams and yelling obscenities from the insured vehicle, bears too tenuous a connection with plaintiff's injuries to impute statutory liability to the vehicle owner. It is uncontroverted that McKiernan stopped the vehicle at least two car lengths away from plaintiff and exited the vehicle before delivering the crippling blow. The plaintiff's injuries resulted from a physical altercation at a distance from the insured vehicle and unrelated to the operation of the insured vehicle.

The plaintiff draws an analogy to a series of uninsured motor vehicle cases to argue that the insured vehicle in this case need not be the actual instrumentality causing his injuries. He maintains that there was a sufficient nexus between McKiernan's use of the insured vehicle and

plaintiff's injuries to hold Quincy liable for those injuries under § 31-33-6. In support thereof, he cites to the facts that the insured vehicle:

> "(1) enabled [Archer] to get to the place where she would be hanging out with her friends that evening, including the defendant McKiernan; (2) provided McKiernan with the means to be at the location where he would ultimately attack [plaintiff]; (3) allowed [plaintiff's] assailant to circle and stalk him several times as [plaintiff] walked home from work that night; (4) facilitated a series of drive-bys that would have been very unlikely had the assailant been on foot, rather than operating Bower's car that evening; (5) allowed [plaintiff's] assailant to flash Bower's high beam lights at plaintiff and his friend each time he drove by; (6) allowed [plaintiff's] assailant to shout obscenities at [plaintiff] and his friend each time he circled them that night; (7) enabled McKiernan to have passengers with him who were 'egging him on[,]' thereby escalating the danger of an encounter with each pass; (8) afforded [plaintiff's] assailant a sense of bravado that he might not have otherwise had if he did not have the protection of Bower's vehicle and several passengers in Bower's car that evening; (9) allowed a back seat passenger <u>in</u> the vehicle to unsuccessfully flick a cigarette at [plaintiff] which may have then struck McKiernan and prompted his exiting the vehicle; (10) afforded [plaintiff's] assailant some degree of anonymity; and (11) gave [plaintiff's] assailant a means of escape from the scene of the assault as his friends said 'you gotta get out of here' before they 'threw [him] in the car' and drove him from the accident scene, leaving [plaintiff] lying unconscious on the pavement."

The cases to which plaintiff refers establish an expansive view of insurance coverage in the context of uninsured motorist provisions. In <u>General Accident Insurance Co. of America v. Olivier</u>, 574 A.2d 1240, 1240-41 (R.I. 1990), the victim was shot and killed by an uninsured motorist immediately following an automobile accident in which she had been a passenger. In that case we adopted the "some nexus" standard from a Florida Supreme Court decision, <u>Government Employees Insurance Co. v. Novak</u>, 453 So.2d 1116, 1119 (Fla. 1984), to guide us in our interpretation of uninsured motorist coverage language requiring the injury to "arise out of the ownership, maintenance or use of the uninsured motor vehicle." <u>Olivier</u>, 574 A.2d at 1242

(emphasis omitted). Even though the victim was killed while standing approximately 117 feet away from the vehicle, this Court in Olivier, 574 A.2d at 1241, 1242-43, determined that there was "a substantial nexus * * * between the decedent's status as a passenger in the insured motor vehicle and her being attacked with a dangerous weapon by an enraged motorist while she was waiting to be interviewed concerning the circumstances of an accident."

In Liberty Mutual Insurance Co. v. Tavarez, 754 A.2d 778, 779 (R.I. 2000), an insured motorist was shot and killed while driving his motor vehicle by two assailants who were pursuing him in an uninsured vehicle. Relying upon Olivier, this Court held that the decedent's death arose out of the use of the uninsured vehicle, which was being used "as a means of transportation to chase [the decedent], and as a shooting platform to bring about his murder." Id. at 780. Subsequently, in Skaling v. Aetna Insurance Co., 799 A.2d 997, 1013 (R.I. 2002), we spoke of "the minimal evidentiary nexus required to establish liability" under the uninsured motorist (UM)/underinsured motorist (UIM) provisions of the insurance policy at issue in that case. This Court in Skaling stated:

> "We recently have had occasion to interpret the meaning of language in an insurance policy that, in order to recover UM UIM, the injuries must arise out of 'the ownership, maintenance or use' of the uninsured/underinsured vehicle and held that this provision does not mean 'proximately caused by, but [has] a broader meaning that simply required some nexus between the motor vehicle and the injury.' [Tavarez, 754 A.2d at 780] * * *. Indeed, we previously have held that it is unnecessary that the automobile be the instrumentality of the injury, nor would 'the type of conduct that causes the injury of necessity be foreseeably identifiable with the normal use of the vehicle.' Id. * * * Thus, insurers have been on notice that the mandates of UM UIM contemplate broad coverage, that simply requires 'some nexus' between the tortfeasor's vehicle and the injury." Skaling, 799 A.2d at 1013.

After careful consideration, we conclude that plaintiff's reliance on the uninsured motorist line of cases is misplaced. Although the policy considerations underlying both the

uninsured motorist provisions in insurance policies and § 31-33-6 are similar—to provide a means of recovery to injured persons—there are fundamental distinctions. The uninsured motorist cases all concern the interpretation of contract language, generally to the effect that the injury "must arise out of the ownership, maintenance or use of the uninsured motor vehicle." See Olivier, 574 A.2d at 1242 (emphasis omitted). Because their function is to extend coverage broadly, such terms should be construed liberally. Id.

Section 31-33-6, on the other hand, abrogates the common law rule that shielded an automobile owner "from liability for the negligence of a person to whom the owner entrusted the vehicle unless such negligence occurred while the operator was engaged in conducting business for the owner." Dias, 727 A.2d at 199. The statute extends liability to the owner whenever the driver has the consent of the owner, unless the driver has provided proof of financial responsibility. Significantly, such liability is extended to the owner only "in the case of an accident." Section 31-33-6. Although we have interpreted this term to include the intentional as well as negligent acts of the driver, we do not understand the statutory language to impute liability upon the owner of a motor vehicle for all acts of a permissive driver, particularly those that are not related to the operation of the vehicle. Rather, there must be a causal relationship between the operation or use of the vehicle and the injuries sustained by the plaintiff.

In the case at hand, plaintiff has failed to demonstrate such a causal connection. His injuries were solely the result of McKiernan's punch. At no time was he ever struck by the insured vehicle itself, nor was either he or McKiernan in the vehicle when plaintiff was punched. The mere fact that McKiernan drove to and from the scene of the incident in the insured vehicle, or even that he and his companions circled plaintiff and taunted him from the vehicle, does not establish the causal connection required to impute liability under § 31-33-6.

We are satisfied, therefore, viewing the facts in the light most favorable to the plaintiff and drawing all reasonable inferences in favor of the plaintiff, that the evidence adduced at trial was not sufficient to survive Quincy's Rule 50 motion. Accordingly, we affirm the judgment in favor of Quincy, but we do so for reasons other than those articulated by the trial justice.[12] See John Marandola Plumbing & Heating Co. v. Delta Mechanical, Inc., 769 A.2d 1272, 1275 (R.I. 2001) (citing Ogden v. Rath, 755 A.2d 795, 798 (R.I. 2000)) (noting "our prerogative to affirm a determination of a trial justice on grounds different from those enunciated in his or her decision").

## IV

## Conclusion

For the reasons stated herein, we affirm the Superior Court's grant of judgment as a matter of law. The record of this case shall be returned to the Superior Court.

---

[12] Because we determine that judgment as a matter of law was properly entered in favor of Quincy, albeit on different grounds from those relied upon by the trial justice, we need not address the issue of whether or not McKiernan "furnished proof of financial responsibility" under § 31-33-6.

- 14 -



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**         Kevin R. Hough v. Shawn P. McKiernan et al.

**CASE NO:**                  No. 2013-89-Appeal.
                                     (PC 08-5961)

**COURT:**                    Supreme Court

**DATE OPINION FILED:**  January 16, 2015

**JUSTICES:**                  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**            Chief Justice Paul A. Suttell

**SOURCE OF APPEAL:**    Providence County Superior Court

**JUDGE FROM LOWER COURT**:

                                     Associate Justice Kristin E. Rodgers

**ATTORNEYS ON APPEAL:**

                                     For Plaintiff:  William M. Heffernan, Esq.

                                     For Defendant:  Kevin S. Cotter, Esq.