**Supreme Court**

No. 2013-213-Appeal.
No. 2014-39-Appeal.
(PC 09-2874)

Dawn K. Roy, in her capacity as the :
administratrix of the estate of Brett A. Roy, et al.

v. :

The State of Rhode Island et al. :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Supreme Court

No. 2013-213-Appeal.
No. 2014-39-Appeal.
(PC 09-2874)

Dawn K. Roy, in her capacity as the      :
administratrix of the estate of Brett A. Roy, et al.[1]

v.           :

The State of Rhode Island et al.      :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.**  A wise jurist once wrote:

> "This is a hard case—hard not in the sense that it is legally difficult or tough to crack, but in the sense that it requires us * * * to deny relief to a plaintiff for whom we have considerable sympathy.  We do what we must, for 'it is the duty of all courts of justice to take care, for the general good of the community, that hard cases do not make bad law.'" Burnham v. Guardian Life Insurance Co. of America, 873 F.2d 486, 487 (1st Cir. 1989) (Selya, J.) (quoting United States v. Clark, 96 U.S. 37, 49 (1877) (Harlan, J., dissenting)).

This is indeed such a hard case.  Tragically, on July 10, 2008, twenty-nine-year-old Brett A. Roy broke his neck when diving into the pond at World War II Veterans Memorial Park in Woonsocket, resulting in his paralysis from the neck down.  Roy's injuries were vast and undeniable.  Roy and his wife, Dawn K. Roy (plaintiffs), individually and as the parents of their two children, filed this action against the state, the Rhode Island Department of Environmental Management (DEM), and two individuals in their official capacities as DEM employees

---

[1] The original plaintiff, Brett A. Roy, passed away while the instant appeal was pending.  An order substituting "Dawn K. Roy, the administratrix of the estate of Brett A. Roy" as a party in this case entered on April 15, 2016.  See Rule 25(a) of the Superior Court Rules of Civil Procedure.

- 1 -

(collectively, the state), alleging several counts of negligence and premises liability. After a multi-week trial and lengthy deliberations, a jury returned a verdict for the state, finding that the state had not "fail[ed] to guard or warn against a dangerous condition, use, structure or activity" or against a "non-obvious, latent dangerous condition" at the pond. Subsequently, both parties filed renewed motions for judgment as a matter of law, which the trial justice denied. However, the plaintiffs also filed a motion for a new trial, which was granted. Thereafter, the state brought the instant appeal arguing that the trial justice erred in granting the plaintiffs' motion for a new trial, and that, as a matter of law, the state owed no duty to Roy. The plaintiffs filed a cross-appeal arguing that their motion for judgment as a matter of law should have been granted and that the trial justice erred in denying their motion for additur or alternatively their motion for a new trial on damages only. For the reasons set forth herein, we vacate the judgment of the Superior Court.

## I

## Facts and Travel

## A

## World War II Veterans Memorial Park and Pond

In July 2008, the pond at World War II Veterans Memorial Park in Woonsocket was one of several bodies of water operated by the state as a recreational facility. At trial several state workers testified to the condition and maintenance of the park and pond.

The director of DEM at the time of the incident, W. Michael Sullivan, testified that the man-made pond was "filled mechanically" and "treated much like a swimming pool." Sullivan testified that, in June 2008, he made the decision to fill the pond, and he appeared at a press

conference where he announced his decision.[2]  Sullivan stated that, in July 2008, there were "no swimming" signs posted, but DEM "expected that there would be people * * * using the park." Sullivan explained that facilities such as the bathhouses were open, but he stated that he "did not ever consider the beach to be open."  Sullivan agreed that it was prohibited under DEM rules to operate the pond on a "swim-at-your-own-risk" basis, and he explained that, "if there were not lifeguards present at a swimming facility, that the swimming facility was closed."  Sullivan explained that, in July 2008, staff on-site at the park had been directed "to tell people that the beach -- that the water was closed to swimming, to point to signage and refer them to that, but it was not expected that they would stand there and order people out [of the water] * * *."

The Associate Director of Natural Resources for DEM, Larry Mouradjian, also testified at trial.  He described the pond, explaining that there was a designated lap pool, a swim area, and a diving platform.  He testified that he had seen the pond with and without water, and, based on his opinion, diving near the wall into the lap pool would be dangerous because it was too shallow.  Mouradjian testified that the pond was typically not filled "until such time as we were able to fully staff the * * * swim area and invite the public to swim at the pond * * *." Mouradjian stated that he thought the decision to fill the pond was untimely "[b]ecause the things normally done to prepare the pond to be open to the public had not been done * * *."  He testified that he had spoken to Sullivan and recommended that the pond be drained or left empty until DEM "beg[a]n to acquire the resources necessary."

The DEM Chief of the Rhode Island Division of Parks and Recreation, Robert Paquette, and the Deputy Chief, John Faltus, also testified at trial.  Paquette confirmed that Mouradjian

---

[2] Sullivan had explained that, in February 2008, World War II Veterans Memorial Park had been "slated for closure" in the budget presented to the Legislature that year.  However, at the end of June, after local officials expressed concern, he made the decision as the Director of DEM to fill the pond.

was hesitant to open the pond and that Mouradjian told him that "we should really look into this." However, Paquette testified that "[Sullivan] was ordering [him] to open up the facility." Paquette also testified that he had never been told that "there was ever a problem with shallow water [along the wall of the pond]." Faltus testified that he was never "officially informed" that people were diving at the pond, but he had "heard hearsay that there's possible diving activity after hours." Faltus stated that generally they did not "allow diving at any [state] swimming areas." However, he also admitted that "[p]eople [were] allowed to possibly do some shallow entry dives," explaining that whether diving was allowed "[d]epends on how you define 'dive.'"

William Mitchell Jr., the Regional Park Manager for DEM in 2008, testified that there was no "system that was in place to warn people of the depth of the water." However, he stated that "if a patron * * * ask[ed] an employee * * * they would advise them as to the depth of the water, [and] if they asked about diving, [they] would tell them the rules and regulations * * *." Mitchell agreed that Roy's injury was "[g]enerally" the type of thing that he could foresee and he was concerned that it was the kind of injury that would happen when he was told to fill the pond before lifeguards had been hired.

Peter Lambert, a DEM caretaker supervisor who was employed at World War II Veterans Memorial Park from 1990 to 2008, testified at trial extensively about the physical characteristics and operation of the park and pond. He explained that, as the caretaker supervisor, he was the "acting park manager," testifying that he "handled pretty much everything that had to do with the park itself: scheduling the staff, supervising the lifeguards, interviewing park rangers, interviewing seasonal people, assigning various work to people." Essentially he either directly worked on or helped supervise everything that needed to be done at the park.

Lambert described the park as "16 acres * * * in the center of * * * Woonsocket [with] a man made [sic] pond, * * * two tennis courts, a playground area, horseshoe pits, * * * [an] Olympic pool area, * * * and the beach area * * *." Lambert described the water depth near the wall where the Olympic pool met the beach area as being "pretty consistent over the years." He testified that, when the pond was drained, he would try to "smooth the bottom" of it. Lambert explained that the pond "wouldn't be perfectly level like a pool," but testified that he "would try to eliminate any erosion, any heels, any high spots." He testified that he was unable to do "any preparatory work to the bottom" of the pond in 2008 because he had been "informed that the park was closing and the beach wouldn't be opened that year, and [his] job was being eliminated." However, Lambert also explained that he did not rake the pond every year because "there were years when there was very little shifting on the bottom." Subsequently, Lambert testified about the diving policies at the pond. He stated that diving had "never [been] allowed." However, he admitted to seeing "people periodically dive * * * off of [the] wall on the pool area, [but] not during hours that [the pond was] in operation."

## B

## The Events of July 10, 2008

Kenneth Henderson, a seasonal laborer for DEM who worked as a groundskeeper at the park in 2008, testified at trial that he was working on July 10, 2008. Henderson stated that he saw "about half a dozen" people swimming in the pond that day but did not tell them that swimming was prohibited because, in his words, "[he] had no authority."

Laura Oliver and Carol Gear had also been at the park on July 10, 2008, and testified at trial. Oliver testified that on July 10 there were no lifeguards, lifeguard chairs, or buoy lines in the pond, and the fountain was off. Oliver said that she allowed her children to go swimming

despite the "no swimming" signs "because there [had been] a write-up in the paper, and nobody told [them] different[ly]." She added that there were often "no swimming" signs in place, even when lifeguards were present and watching the swimmers. However, Oliver testified that a DEM employee, who she later learned was a groundskeeper, had told her children not to jump in the water. Oliver explained that she saw people jumping and "do[ing] all kinds of stuff" off the diving platform on July 10. However, she knew from experience that diving was not allowed in the pond because in previous years if someone dove into the water, then "lifeguards would be on top of it. If they kept doing it, [the lifeguards] would tell them they had to leave." She added that she never saw anyone get hurt while diving prior to July 10. Oliver described Roy's dive as "a belly flop kind of dive; not a complete dive."

Gear testified that she had been to the pond to swim "[t]hree times" before July 10, 2008, and had seen people dive, but had never seen anyone injured from diving before Roy suffered his injury. Gear described Roy's actions that she witnessed on July 10, stating: "He threw something on the ground, and [ran], like you run when you bowl, and then he just dove in." She labeled Roy's dive as a "[r]egular kind of dive." She clarified that she would call it "a shallow dive." She explained that "[i]t was more like he * * * just * * * put his head down and kind of went in. It wasn't like a real dive like on a diving board."

Hope Braybon, who accompanied Roy to the pond on July 10, also testified to the events of the day. Braybon stated that she watched Roy "jog" from the car in the parking lot and "d[i]ve in." She testified that, as Roy was diving, she "was telling him not to dive over there * * * because it was shallow water."

Roy was unable to testify at trial but his deposition was read into the record. Roy was six feet tall and twenty-nine years old at the time of the incident. Roy testified that on July 10 he

had dropped Braybon, her daughter, and his children at the park and "they * * * walked towards the beach." He recalled seeing "20 to 30 people, small children, adults, adolescent children in the middle of the pond" swimming, which indicated to him that the park was open. He testified that he "never saw a sign that said '[n]o [s]wimming.'" Roy further testified that, when he arrived at the park, he "walked over towards the corner [of the pond], * * * [a]nd * * * wasn't going to jump in," but, he described the day as "hot, * * * very hot. So, [he] figured * * * [he would] jump in." He stated that he looked at the water and "[i]t looked deep enough." He described the water as "murky" and said that he "definitely couldn't see the bottom." He explained that "if the water was too shallow, [he would] be able to see it." Before jumping in, Roy returned to his car to put his things away and then he "walked down to the end[,] * * * dove in the water[,] and [he] broke [his] neck." Roy described his dive as a "shallow dive, just like a normal, flat dive," meaning, "the only parts that [he] would want to hit the water would be the * * * tops of [his] hand and [his] belly." Roy testified that around July 2007 he dove in the same spot, and "[n]othing was ever said to [him]." Roy admitted that he knew there was soil erosion in the pond, and, consequently, that soil had been added to the pond in the past. Roy stated that "the way that [he] check[ed] the depth of the water * * * was probably irresponsible * * *."

## C

### The Jury Verdict and Posttrial Motions

After the close of evidence, both parties filed motions for judgment as a matter of law pursuant to Rule 50 of the Superior Court Rules of Civil Procedure, and the trial justice denied both motions. Subsequently, the jury was charged on May 25, 2011. During the course of deliberations, the jury exchanged over fifty notes with the trial justice. On the morning of the third day of deliberations, the trial justice addressed the jury and asked the jurors to keep

deliberating because she was "really confident that the eight [jurors were] going to be able to * * * reach a decision that is fair and just for everyone."

On the fourth day of deliberations, the jury asked the court to "clarify if [six] jurors are for one party and [two] jurors are for another[,] [d]o the questions have to be answered in favor of the way the six jurors feel and the [other two jurors would] not be able to express their own feelings[?]" The trial justice responded that she was "not exactly sure what [they] [were] asking but the jury's verdict must be unanimous with all [eight] [jurors] agreeing." Later that day, the trial justice held a chambers conference at which she suggested to counsel that, in light of the jury's note, the jury might be split six to two.

During the fifth day of deliberations, the jury asked the trial justice to reinstruct them that they needed to follow the instructions of law and not their emotions. After a series of conferences with juror No. 109 and the jury foreperson, individually, the trial justice excused juror No. 109. At approximately 3:50 p.m. that day, the jury sent a note to the trial justice that it could not come to a unanimous agreement. Approximately ten minutes later the trial justice responded: "Is there anything we can do to assist you?" The jury responded that "nothing else will make a difference" and indicated a six-to-one split. Thereafter, the trial justice released the jurors for the day and asked counsel to think of options and to determine from their respective clients whether they would accept a split verdict.

The following day—day six of deliberations—both parties agreed to accept a six-to-one split decision if the jury was unable to reach a unanimous verdict. The parties expressed that they "understood at the time that the jury would be sent to deliberate" and that if the jury "inform[ed] the [c]ourt that it could not reach a unanimous verdict, [the trial justice] would then disclose [to the jury] that the parties [had] agreed to accept a [six] to [one] split decision * * *."

Subsequently, the jury exchanged additional notes with the trial justice and returned for additional instructions on the Recreational Use Statute and the issue of liability, included as questions 1 and 2 on the verdict form. Thereafter, the jury indicated that it had reached a verdict.

The jury reached a unanimous verdict and found that the state had not "willfully or maliciously failed to guard or warn against a dangerous condition, use, structure or activity at the pond * * *" and therefore was not liable under question 1. However, the jury found that the state was liable under question 2 for "willfully or maliciously fail[ing] to guard against a non-obvious, latent dangerous condition, knowing that there existed a strong likelihood that a user of the swimming pond would suffer serious injury or death[.]" The jury rejected the assumption-of-the-risk defense and found that both parties were negligent and assigned a 50/50 split with "zero" damages. The trial justice then called counsel to sidebar where plaintiffs argued that the jurors were not following the instructions because they found in favor of them but awarded no damages; the state disagreed. The trial justice instructed the jury that they were required to award damages. At that time, the state moved for a mistrial "based on the inconsistencies of the answers to the questions on the verdict sheet"; plaintiffs objected, and the trial justice denied the motion. The jury then sent a note explaining that they had "reached a unanimous verdict [because] no money was awarded." They explained that if they had to award damages, "part of [the] jury [would] have one answer [and] part [would] have another. In other words, [they would] have to begin again." The trial justice clarified with the jury that they were "referring to the [six-to-one] split/vote" and then released the jury for the day.

After the jury was sent home, the trial justice held a chambers conference with counsel. The parties discussed four potential options to consider: (1) a mistrial; (2) accept a six-to-one verdict; (3) accept half of the verdict; or (4) allow the verdict to stand. On the seventh day of

deliberations, plaintiffs made a motion for additur or, in the alternative, for a new trial on the issue of damages. The trial justice denied plaintiffs' motion and offered the parties a choice of accepting a split verdict or a mistrial. Both parties agreed to accept a six-to-one split verdict. The trial justice notified the jury that the parties would accept a six-to-one verdict. The jury returned the verdict and answered "no" to questions 1 and 2—finding no liability on behalf of the state, and judgment entered.

Following the jury verdict, both parties made renewed motions for judgment as a matter of law. In support of its motion, the state argued that plaintiffs failed to establish the state's liability under the Recreational Use Statute and that, as a matter of law, Roy's conduct was so "highly dangerous" that "no duty was owed to him." The plaintiffs argued that the state's witnesses admitted sufficient facts at trial to establish the state's liability as a matter of law under the Recreational Use Statute. Additionally, plaintiffs moved for a new trial on damages, or, in the alternative, a new trial on all the issues. The trial justice issued a written decision on March 26, 2013, denying both parties' motions for judgment as a matter of law, and granting plaintiffs' motion for a new trial on all the issues. The state timely appealed this decision, and plaintiffs filed a cross-appeal.

## II

### Parties' Arguments on Appeal

On appeal, the state argues that the trial justice erred in refusing to apply the decisions in Banks v. Bowen's Landing Corp., 522 A.2d 1222 (R.I. 1987) and Bucki v. Hawkins, 914 A.2d 491 (R.I. 2007), which, the state contends, "stand for the proposition that the [s]tate owed no duty to Roy to protect him from an open and obvious natural condition * * *." The state maintains that, "under the proper application of the Recreational Use Statute, the evidence fails

to establish that the state willfully and/or maliciously failed to warn against a dangerous condition." The state also argues that "Roy assumed the risk of injury by diving into murky water without first checking its depth" and that plaintiffs failed to prove the element of causation. Furthermore, the state contends that it is shielded from liability under the theory of discretionary immunity. The state also asserts that "the trial justice misconstrued material evidence and committed significant errors of law in granting plaintiffs' motion for a new trial." However, the state adds, if the matter is remanded for a new trial, "the statutory cap on damages should apply."

In response, plaintiffs argue that the trial justice properly granted their motion for a new trial. The plaintiffs aver that they proved liability under the Recreational Use Statute and that the "open and obvious danger" rule articulated in <u>Bucki</u>, 914 A.2d at 496, is inapplicable here due to distinguishable facts. The plaintiffs maintain that Roy could not have "assumed the risk" under these facts as a matter of law and that plaintiffs proved proximate causation. Furthermore, plaintiffs contend that the trial justice and two motion justices properly applied the law and limited the state's defenses with respect to governmental immunity and the damages cap. On cross-appeal, plaintiffs argue that the trial justice incorrectly denied their motions for additur, a new trial on the issue of damages only, and judgment as a matter of law. Additionally, plaintiffs argue that a new trial was warranted based on other legal errors made by the trial justice and that the second jury verdict was "the result of bias, prejudice, or passion."

Because we conclude that the state owed no duty to Roy, we shall address only the state's renewed motion for judgment as a matter of law.

## III

## Judgment as a Matter of Law

### A

### Standard of Review

"In reviewing a trial justice's decision on a motion for judgment as a matter of law, this Court is bound to follow the same rules and legal standards as govern the trial justice." Hough v. McKiernan, 108 A.3d 1030, 1035 (R.I. 2015) (quoting Perry v. Alessi, 890 A.2d 463, 467 (R.I. 2006)). "The trial justice, and consequently this Court, must examine 'the evidence in the light most favorable to the nonmoving party, without weighing the evidence or evaluating the credibility of witnesses, and draw[] from the record all reasonable inferences that support the position of the nonmoving party.'" Id. (quoting Perry, 890 A.2d at 467). Thus, a trial justice should enter judgment as a matter of law "when the evidence permits only one legitimate conclusion in regard to the outcome." Id. (quoting Long v. Atlantic PBS, Inc., 681 A.2d 249, 252 (R.I. 1996)).

### B

### Discussion

The Rhode Island Recreational Use Statute, G.L. 1956 chapter 6 of title 32, limits the liability of landowners, declaring that one

> "who either directly or indirectly invites or permits without charge any person to use that property for recreational purposes does not thereby:
>
> "(1) Extend any assurance that the premises are safe for any purpose;
>
> "(2) Confer upon that person the legal status of an invitee or licensee to whom a duty of care is owed; nor

- 12 -

"(3) Assume responsibility for or incur liability for any injury to any person or property caused by an act of omission of that person." Section 32-6-3.

The purpose of this statute "is to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting their liability to persons entering thereon for those purposes." Section 32-6-1. In order to achieve this, "the [Recreational Use Statute] modifies the common law by treating users of public and private recreational properties as trespassers, thus greatly reducing the duty of care that owners owe to recreational users." Symonds v. City of Pawtucket, 126 A.3d 421, 424 (R.I. 2015). As we have noted, "it is clear from the unambiguous language of the 1996 amendment [to the Recreational Use Statute] that the [L]egislature intended to include the state and municipalities among owners entitled to immunity under the statute." Id. (quoting Pereira v. Fitzgerald, 21 A.3d 369, 373 (R.I. 2011)).[3]

Although the Recreational Use Statute limits liability, this limitation is not absolute. Section 32-6-5 provides, in relevant part: "(a) Nothing in this chapter limits in any way any liability which, but for this chapter, otherwise exists: (1) [f]or the willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity after discovering the user's peril * * *." "Thus, the Legislature declared that all people who use this state's public recreational resources are classified as trespassers to whom no duty of care is owed, save to refrain from willful or malicious conduct as defined in the [Recreational Use Statute]." Berman v. Sitrin, 991 A.2d 1038, 1044 (R.I. 2010).

On appeal, the state argues that the evidence presented at trial did not establish that the state willfully and/or maliciously failed to warn against a dangerous condition. Specifically, the

---

[3] In 1996, the General Assembly amended the definition of "owner" in G.L. 1956 § 32-6-2(3) to include the state and municipalities. P.L. 1996, ch. 234, § 1.

state argues that "there was no evidence of a substantial number of injuries flowing from a known dangerous condition"; that "the state did not fail to guard or warn against a dangerous condition, use, structure, or activity"; and that "no witness made testimonial admissions sufficient to extinguish protection under the Recreational Use Statute." Conversely, plaintiffs argue that they proved liability under the Recreational Use Statute because the evidence supported a finding that the state "breached the duty to refrain from willful and malicious failures to guard and warn against known latent conditions." In support of this argument, plaintiffs rely on Berman.

In Berman, 991 A.2d at 1042, the plaintiff was walking on the Newport Cliff Walk when the ground "gave way," causing the plaintiff to suffer injuries that rendered him a quadriplegic. This Court specifically noted that this was "not * * * a case in which a visitor came too close to the edge of a cliff and fell off, as tragic as that would be." Id. at 1049. Rather, "the events leading to [the plaintiff's] tragic injury were caused by latent defects in the structure of the Cliff Walk that [were] not obvious to the occasional visitor." Id. This Court explained that "the record before [it was] replete with evidence demonstrating that * * * the city knew that the forces of natural erosion were taking a toll on the Cliff Walk." Id. at 1050. Thus, this Court concluded that "because of the multiple incidents of death and grievous injury * * * the city [could] not successfully defend [the plaintiff's] claim based on an assertion that it had no specific knowledge of [the plaintiff] or any peril confronting him." Id. at 1051. Consequently, this Court held that "the immunity provided by the [Recreational Use Statute] [was] not available to defendant City of Newport, in the context of the Cliff Walk" because a "fact-finder reasonably could find that * * * the city voluntarily and intentionally failed to guard against the dangerous condition,

knowing that there existed a strong likelihood that a visitor to the Cliff Walk would suffer serious injury or death." Id. at 1052, 1053.

The plaintiffs argue that this case is comparable to Berman because the "record is replete with evidence of DEM's admitted knowledge of numerous unique dangerous conditions, including shallow water in areas where users had been known to dive from the park's structures, and the historic presence of the sandbar in the same (normally deeper) area." The plaintiffs maintain that the "shallow water and dangers of diving at this particular facility were not obvious to users * * * yet were in fact known to DEM."

In the case at bar, although the state admitted knowledge of the unique features of the pond, Roy also admitted that he was aware of the danger of making a dive into shallow water and that "the way that [he] check[ed] the depth of the water * * * was probably irresponsible * * *." He confirmed that he knew the soil in the pond was eroding and, consequently, that soil was added to the pond. We would note that, examining the evidence in the light most favorable to the plaintiffs as we must, the actions of the defendants are a far cry from the egregious conduct attributed to the City of Newport in Berman. There, we held that "[i]t is because of the multiple incidents of death and grievous injury that we conclude that the city may not successfully defend this claim based on an assertion that it had no specific knowledge of [the plaintiff] or any peril confronting him." Berman, 991 A.2d at 1051. Here, there is only one indication in the record of a relatively minor injury reported several days before Roy's catastrophic injuries. Therefore, we are of the opinion that, under these circumstances, this case is distinguishable from Berman. There is no evidence to support a finding that the state "willful[ly] or malicious[ly] fail[ed] to guard or warn against a dangerous condition, use,

- 15 -

structure, or activity after discovering [a] user's peril * * *." See § 32-6-5(a)(1). Thus, the state's motion for judgment as a matter of law should have been granted.

Moreover, even if the Recreational Use Statute did not apply, this Court has held that the danger of diving in and of itself is an "open and obvious" danger, Bucki, 914 A.2d at 496, one of "common knowledge," Banks, 522 A.2d at 1225, such that a landowner does not owe a duty of care to warn individuals who enter the premises. In Banks, 522 A.2d at 1224, the plaintiff filed a negligence claim for injuries he suffered after diving off a railing on the defendant's property into the Newport Harbor. This Court held that the defendants had not owed any duty of care to the plaintiff in that case in part because "requiring citizens to place warnings against[—]and barriers preventing persons from[—]diving into shallow water would provide little disincentive to individuals * * *. As a practical matter, the danger of diving into shallow water is one of common knowledge, and one [the plaintiff] admit[ted] he was aware of." Id. at 1225. Similarly, in Bucki, 914 A.2d at 493, the plaintiff filed a negligence claim for injuries he sustained after diving into a lake while he was a guest at one defendant's waterfront property. This Court concluded that the plaintiff's harm was foreseeable but again held that the defendants did not have a duty to warn of the dangers of diving. Id. at 496-97. This Court stated that:

> "It is only reasonable for a diver, who cannot ascertain the water's depth by looking, to further inspect the area before diving into dark water. The danger of diving into shallow water was open and obvious to a twenty-four-year-old man, regardless of whether a sign was erected alerting him to the danger." Id. at 496.

Thus, this Court held that "as a matter of law, [the] plaintiff must be held to have had knowledge and an appreciation of this risk [because][,] [u]ltimately, it was [the] plaintiff's own behavior that caused his injuries." Id.

We also note that other courts have reached similar conclusions. For example, the Maryland Court of Appeals commented that:

> "Bodies of water like the stream involved in this case have historically and consistently been afforded distinctive treatment in the law relating to landowners' liability. The necessity, or at least desirability, of maintaining such bodies of water, coupled with known inherent dangers and the difficulty of effectively protecting against those dangers, have led courts across the country to pronounce water an 'open and obvious danger,' for which no warning or special precaution is ordinarily needed." Casper v. Charles F. Smith & Son, Inc., 560 A.2d 1130, 1134-35 (Md. 1989).

In a case affirming the grant of summary judgment in favor of the Chicago Park District against swimmers who were injured when they dove into Lake Michigan from concrete seawalls, Bucheleres v. Chicago Park District, 665 N.E.2d 826, 827, 828, 839 (Ill. 1996), the Illinois Supreme Court pronounced:

> "In cases involving obvious and common conditions, such as fire, height, and bodies of water, the law generally assumes that persons who encounter these conditions will take care to avoid any danger inherent in such condition. The open and obvious nature of the condition itself gives caution and therefore the risk of harm is considered slight; people are expected to appreciate and avoid obvious risks." Id. at 832.

The Illinois Supreme Court further reasoned that "bodies of water are ordinarily considered to be open and obvious conditions and thereby carry their own warning of possible danger." Id. at 835. This is clearly the position adopted by this Court in Bucki, 914 A.2d at 497, where this Court stated that "[w]e are of the opinion that in this case [the] defendant did not owe [the] plaintiff a duty of care, but, rather, that [the] plaintiff voluntarily exposed himself to the perils of an open and obvious danger." Because it is our considered opinion that the state bore no liability for Roy's injuries—either because diving is an open and obvious danger or because it was protected

under the Recreational Use Statute—we conclude that the trial justice erroneously denied its motion for judgment as a matter of law.

## IV

## Conclusion

For the reasons stated herein, we vacate the judgment of the Superior Court and remand the case with instructions to enter judgment in favor of the state. The record shall be returned to the Superior Court.



# RHODE ISLAND SUPREME COURT CLERK'S OFFICE

## *Clerk's Office Order/Opinion Cover Sheet*

---

**TITLE OF CASE:** Dawn K. Roy, in her capacity as the administratrix of the estate of Brett A. Roy, et al. v. The State of Rhode Island et al.

**CASE NO:** No. 2013-213-Appeal.
No. 2014-39-Appeal.
(PC 09-2874)

**COURT:** Supreme Court

**DATE OPINION FILED:** June 23, 2016

**JUSTICES:** Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:** Chief Justice Paul A. Suttell

**SOURCE OF APPEAL:** Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Susan E. McGuirl

**ATTORNEYS ON APPEAL:**

For Plaintiffs:   Patrick C. Barry, Esq.
Douglas E. Chabot, Esq.

For State:   Rebecca T. Partington
Department of the Attorney General

Adam J. Sholes
Department of the Attorney General