July 1, 2022

**Supreme Court**

No. 2020-150-Appeal.
No. 2020-224-Appeal.
(PC 11-3983)

(Concurrence begins on
Page 62)

Johnston Equities Associates, LP, et al.  :

v.                          :

Town of Johnston et al.            :

NOTICE:  This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

**Supreme Court**

No. 2020-150-Appeal.
No. 2020-224-Appeal.
(PC 11-3983)

(Concurrence begins on
Page 62)

Johnston Equities Associates, LP, et al.  :

                  v.                :

Town of Johnston et al.       :

Present: Suttell, C.J., Goldberg, Robinson, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.** These appeals concern a sewer line serving a federally subsidized affordable-housing apartment complex known as the "Park Plaza Apartments" in Johnston, Rhode Island. In Superior Court, the plaintiffs, Johnston Equities Associates, LP (JEA) and Stay Away From The Cans, LLC (SAC) (collectively plaintiffs),[1] obtained a $1.2 million jury verdict in their favor for a trespass claim against the defendants, the Town of Johnston; Joseph Chiodo, in his capacity as Finance Director of the Town of Johnston; and Robert

---

[1] In November 2017, SAC purchased the Park Plaza Apartments, which are located at 20 Park Street in Johnston, Rhode Island, from JEA; JEA thereafter added SAC as a party plaintiff in its second-amended complaint filed on March 23, 2018.

Parker,[2] in his capacity as the Director of Public Works for the Town of Johnston (collectively the town or defendants), for allowing sewage from the town's sewer pipelines to be discharged into JEA's private sewer pipeline. Following the jury verdict, the trial justice ruled that the $100,000 statutory cap under G.L. 1956 § 9-31-3 was applicable because the plaintiffs' claim focused on the design of the town sewer system and thus constituted a governmental function. Before this Court are both an appeal by the plaintiffs and a cross-appeal by the town from the resulting judgment.

The crux of plaintiffs' argument on appeal is that the trial justice erred when he determined that the town was engaged in a governmental function, rather than a proprietary function. The plaintiffs therefore submit that the trial justice erred in (1) applying the statutory cap on liability to the jury's verdict; (2) determining that plaintiffs are precluded from collecting prejudgment interest; and (3) *sua sponte* finding that, even if plaintiffs were entitled to collect prejudgment interest, the interest should be calculated from the date of the jury's verdict.

On cross-appeal, the town submits that the trial justice erred in denying its requests for judgment as a matter of law. The town additionally contends that it is immunized from liability under the public duty doctrine. Further, the town argues

---

[2] Pursuant to Rule 25(d)(1) of the Superior Court Rules of Civil Procedure, Robert Parker was automatically substituted for his predecessor after becoming the Director of Public Works for the Town of Johnston.

that the trial justice erred in denying the town's motion for a new trial, because, the town maintains, the jury did not follow instructions in awarding damages; alternatively, the town asserts that the request for a remittitur should have been granted.

Subsequent to oral argument, we determined that these appeals should be consolidated for opinion. After thoroughly reviewing the record and considering the parties' written and oral arguments, we affirm in part and vacate in part the judgment of the Superior Court.

In particular, we uphold the trial justice's denial of the town's motions for judgment as a matter of law. We further hold that the trial justice did not err in not applying the public duty doctrine; however, we also hold that the trial justice erred in applying the statutory cap on damages and in denying prejudgment interest. Finally, we uphold the trial justice's denial of the town's motion for a new trial and/or remittitur.

# I

## Facts and Travel

JEA filed its initial complaint in Providence County Superior Court on July 13, 2011, alleging that the town allowed the connection of an illegal sewer line to JEA's private sewer line; according to JEA, this resulted in a continuing trespass of sewage discharging into JEA's private sewer system. As noted *supra*, JEA filed a

second-amended complaint on March 23, 2018, which added SAC as a party plaintiff. A five-day jury trial was held in Superior Court in February 2019. After dismissing three counts of plaintiffs' second-amended complaint, only plaintiffs' claims for continuing trespass (count three), negligence (count five), and unjust enrichment (count six) remained.

The plaintiffs' first witness was H. Charles Tapalian, who was a general partner of JEA as well as a civil engineer with a special focus on soils and structures. Tapalian testified that, with respect to the construction of the Park Plaza Apartments at 20 Park Street in Johnston, Rhode Island, he "was brought in to be the guy that put the project together[.]" According to Tapalian, construction was completed at the end of 1973 or in early 1974. He testified that the sixty-two-unit building was a low-income apartment housing complex and that the mortgage was guaranteed by the United States Department of Housing and Urban Development (HUD).

According to Tapalian, JEA owned a pneumatic pump station near the Park Plaza Apartments (the Park Plaza pump station), which pumped sewage up a private line on Park Street (the Park Street line) to the public sewer system on Atwood Avenue. He testified that problems with the Park Plaza pump station started in the 1980s. According to Tapalian, the pneumatic pump started breaking down, requiring excessive maintenance and having motor burnouts; such issues, he indicated, were occurring "once or twice a week." He testified that between twelve and fifteen

motors were replaced for the pneumatic pump. Tapalian stated that JEA switched to a grinder pump for the Park Plaza pump station, which initially helped but ultimately began experiencing the same problems as the pneumatic pump.

Tapalian testified that JEA eventually discovered that nearby town pump stations from across the Pocasset River were pumping sewage into the Park Street line; he also noted that the River Drive area—where those nearby town pump stations were located—had expanded development in the 1980s. He indicated that the town's sewer line from the River Drive area was tied into the Park Street line sometime in the early 1980s; however, the town never paid JEA for use of the Park Street line.

Tapalian also testified that he was aware of the town's claim that it owned the Park Street line based on a contract executed on May 10, 1973, between the town and Donatelli Building Co., Inc. (Donatelli Building), the general contractor for all work on the Park Plaza Apartments (the agreement). The agreement was entered as a full exhibit at trial. According to the agreement, which was signed by "Robert Donatelli" on behalf of Donatelli Building, the town sewer district was to take over all sewer lines at the Park Plaza Apartments. However, Tapalian testified, Donatelli Building had no authority to transfer JEA property to the town because Donatelli Building was only a 1 percent limited partner, and only general partners were authorized to transfer any of JEA's property. He further testified that the general

- 5 -

partners did not agree to transfer the Park Street line to the town, nor did they tell the town that Donatelli Building had the authority to transfer the line. Tapalian additionally indicated that the town did not maintain or repair the Park Street line and that the town never ordered JEA to stop working on the line when the town became aware of the problems prior to the lawsuit filed by JEA.

According to Tapalian, JEA incurred damages in maintaining and replacing equipment for the Park Plaza pump station and the Park Street line (collectively the Park Plaza sewer system) because the system was burdened by the additional sewage from the River Drive area. To that end, he identified invoices for work done on the Park Plaza sewer system and a summary of those invoices, dating from 1993 to 2017. Tapalian testified that JEA was claiming damages of 80 percent of the excess work JEA had performed on the Park Plaza sewer system; he stated that 80 percent of the invoices from University Industries for excess sewer work amounted to approximately $170,000.[3] Tapalian further testified that 40 percent of David Iascone's work was on the sewer system, and he estimated that Iascone was paid an average of $25,000 per year for the excess sewer work over a period of approximately twenty-three years.

---

[3] Tapalian testified that he owns University Industries and that it does "the billing for all the maintenance work, maintenance contracts, [and] any extraordinary repair work" for Park Plaza.

The plaintiffs then called Iascone, whose business, DICON Corporation (DICON), performed sewer maintenance and repair work. Iascone indicated that he worked on the pneumatic pump at Park Plaza in the early 1990s and that it "always" had problems because the system failed to work; such failure caused "severe backups" and, at times, flooding with respect to eight or nine apartments. He testified that, when JEA switched from the pneumatic pump to the grinder pump in the early 1990s, he and his company performed the work for the changeover and replaced the check valves for the Park Plaza pump station; while he did not have records for his work dating back to 1990, he remembered performing the work. Iascone recalled that he billed JEA between $40,000 and $45,000 for his work, and he estimated that 40 to 45 percent of that was for sewer work.

Iascone further testified that the grinder pump did not solve the problems with the Park Plaza sewer system; major backups continued to occur, and apartments were flooded with sewage. According to Iascone, DICON and JEA finally discovered the problem with the system in 2010 when DICON shut down the system and drained it of fluid. Iascone testified that, once the system was shut down, workers heard running water, which, according to Iascone, should have been impossible with a closed private system; nevertheless, water rushed into the tank.

According to Iascone, he began knocking on doors until he talked to one neighbor who "mentioned that there was another lift station across the Pocasset

- 7 -

River on * * * River Drive." Iascone testified that he then drove to the town's River Drive pump station and tried to contact the emergency number provided—"the Town of Johnston's DPW number"—to no avail. He stated that he then shut off the River Drive pump station, which resulted in stopping the water flow into the Park Plaza pump station tank; he indicated that this was a "surefire thing that told [him] that the Town of Johnston had their line tied into [JEA's] private sewer force main." Iascone stated that he performed the same exercise with the town-owned LaFazia Drive pump station and determined that it was also "contributing to [the] problem."

Iascone testified that he contacted Lorri Caruso, the engineer for the Town of Johnston, who, after being informed of the problem, met Iascone at the River Drive pump station. Iascone stated that, after Caruso indicated that it would be "impossible" for the Town of Johnston to be tied to a private line, he sent her over to Park Street and he demonstrated what he had previously discovered, "so she could see firsthand[.]" Iascone testified that Caruso said she was "baffled" and that the sewage "was supposed to go up River Drive hill and tie into Plainfield Street."

Iascone then testified as to the ownership of the Park Plaza pump station. He testified that JEA owned the Park Street line from about 1973 until the property was sold in 2017. He testified that he was only paid by JEA, and further that the town did not maintain or repair the Park Plaza pump station or the Park Street line, nor

was he contacted by or paid by the town to perform maintenance or repair work on either.

The plaintiffs called their third witness, Dennis D'Ambra, who worked on the Park Plaza pump station through his company D'Ambra Construction, assisting the full-time maintenance superintendent at the Park Plaza Apartments as needed. D'Ambra testified that there were many breakdowns and backups in the Park Plaza sewer system in the 1980s. He stated that major functional issues arose with the pneumatic pump seven or eight times per year and that small issues occurred about every six weeks. He further confirmed Iascone's testimony that the grinder pump installed later had experienced the same problems as the pneumatic pump. D'Ambra additionally verified Iascone's testimony that the origin of the problems with the Park Plaza pump station was determined in 2010, when the town's connection to the sewer system was discovered.

D'Ambra testified that approximately 35 to 40 percent of the payments he received from Park Plaza were for his work on the sewer system. He observed "grease"—a heavy, thick consistency in a sewer system that includes cooking oils, shampoos, hair oils, and other substances—in the Park Street line when he worked on it several times. D'Ambra further stated that he power-washed the Park Street line about every ten to twelve months. He noted that the power-washing helped the line until it clogged again and that there was too much sewage flowing through the

four-inch line. He additionally indicated that he installed the wrong check valves on an emergency basis until the correct ones came in because he needed to keep the system running for a few days; he testified that he "had no choice" and that "it was either [install the wrong check valves] or shut the building down and vacate it."

D'Ambra testified that JEA owned the Park Plaza pump station and the Park Street line. He further stated that the mayor of Johnston and a Johnston Town Council member showed up to observe repairs to the Park Street line on one occasion; however, the town did not assist in the repair work on any occasion.

The plaintiffs then called Stephen Macchioni, who testified that he served as an advisor to former Johnston Mayor William Macera before he was elected to serve as a member of the Johnston Town Council from 2000 to 2004. Macchioni indicated that he was also friendly with Tapalian. He testified that he first became familiar with the Park Plaza Apartments in the spring of 1999, when Mayor Macera asked him to meet at the site because a number of people were "raising concerns about the condition of the sewers" there. Macchioni stated that, when he arrived at the site, there was a large hole that extended into the street. He confirmed that Councilwoman Mary Cerra, who was also onsite, told Mayor Macera that Tapalian needed to fix the sewer problem, and that Mayor Macera responded that Tapalian and his men were doing their best to fix the problem. He further confirmed that

neither Mayor Macera nor Councilwoman Cerra indicated that the sewer was the town's issue or that the town would fix the sewer.

Next, Joseph Federico testified as an expert witness on behalf of plaintiffs, having been qualified as an expert in the field of civil engineering, specializing in wastewater. Federico testified that he was asked to determine whether the town's sewer line was a significant contributing factor to the failures and problems of the Park Plaza pump station. He stated that he inspected both the Park Plaza pump station and the town's River Drive and LaFazia Drive pump stations. He indicated that, in preparing his opinion, he reviewed and relied upon an engineering report by Joe Casali Engineering, Inc. (the Casali report), which included an Inland Waters report, as well as reports from Pare Engineering. Federico indicated that an Existing Conditions Plan, attached to a September 9, 2011 Pare Wastewater Facility Update report, did not depict a sewer line tie-in from the River Drive pump station to the Park Street line. He indicated that, as of September 13, 2011, the town thought the sewage from the River Drive area was going away from Park Street and toward Plainfield Street.

Federico testified that he also reviewed the Community Development Block Grant application by the town to obtain grant money to relocate the River Drive pump station and the LaFazia Drive pump station out of a 100-year flood plain area and into a 500-year flood plain (the grant). He indicated that those pump stations

were relocated, and that the line connected to the Park Street line was decommissioned in July 2017.

The plaintiffs' counsel then questioned Federico as to whether there was any correspondence in the grant study documents between the town engineer and the town council regarding the grant studies, to which defense counsel objected. At sidebar, defense counsel argued that Federico had not referenced such correspondence in answers to interrogatories or in his opinion; plaintiffs' counsel countered that Federico reviewed the correspondence in forming his opinion. The trial justice overruled defense counsel's objection.

A letter dated June 8, 2012, from town engineer Lorri Caruso to the town council was then admitted as a full exhibit, plaintiffs' Exhibit 26, without objection. The letter outlined proposed design alternatives for removing the pump stations from the River Drive area. A letter from Mayor Joseph Polisena discussing the grant was also admitted as a full exhibit, plaintiffs' Exhibit 27, without objection. In that letter, Mayor Polisena indicated that the relocation of the River Drive and LaFazia Drive pump stations "ha[d] the potential to improve operation of a privately-owned pump station on Park Street east of the Pocasset River."

Federico further testified that the Casali report contained information that the sewage from the town's River Drive pump station was pumped into the Park Street line. To determine the amount of sewage flowing into the Park Street line, Federico

used the rule that one bedroom produces 100 gallons of sewage per day. Federico estimated that 9,300 gallons of sewage were produced by Park Plaza based on its ninety-three bedrooms. He testified that, based on the Casali report, 21,300 gallons of sewage flowed from the River Drive pump station to the Park Street line. Taking into account wastewater that would infiltrate into the system from leaks, Federico testified that the River Drive pump station would send an additional 3,190 gallons of sewage to the Park Street line, for a total of 24,490 gallons. He also testified that groundwater infiltrated the pipes from the Pocasset River flood plain, which increased the flow of sewage to 46,820 gallons per day from the River Drive area to the Park Street line. Federico testified that 83 percent of the sewage flow into the Park Street line was from the River Drive pump station, and 17 percent of the sewage was from the Park Plaza pump station.

Federico further testified that, in addition to the amount of sewage flowing from the River Drive pump station, the grease buildup in the Park Street line contributed to the problems with the Park Plaza sewer system. He indicated that the Inland Waters report accompanying the Casali report described heavy grease in all the River Drive area lines that would flow into the Park Street line from the River Drive pump station. He opined that grease was also collecting in the Park Street line, noting that Iascone had reported grease in the Park Street line. He further opined that the grease deposits and heavy flow of sewage from the River Drive pump

station caused the Park Plaza pump station to work harder to push sewage through the Park Street four-inch line and to ultimately wear out. He also testified that, when the Park Plaza pump was not working, the grease solids continued to build up in the Park Street line; in that case, the grease solids coming from the River Drive pump station would also flow down toward the Park Plaza pump station. He testified that grease solids could build up at the check valve and hold the check valve open.

On cross-examination, Federico testified that the Park Street line is a four-inch line. He stated that he was not able to personally see inside the Park Street line to check it for rags and debris. He agreed that there would be no buildup of debris if the Park Street line was jet-power-washed every ten months. He further testified that, if the line was being power-washed every ten months, it must have been accumulating sludge very rapidly.

On redirect examination, Federico identified another letter from Mayor Polisena, which Federico indicated was in the grant package that he had reviewed. The plaintiffs' counsel moved to have the letter admitted as a full exhibit, to which defense counsel objected based on relevance; the trial justice overruled that objection and the letter was admitted and marked as plaintiffs' Exhibit 29. Federico then identified an environmental assessment from the same package, which was prepared by Johnston's town planner and certified by Mayor Polisena. The plaintiffs' counsel moved to admit the environmental assessment as a full exhibit, to

which defense counsel objected on the basis of relevance. The trial justice "overruled the relevance and the 403 exception" and admitted the environmental assessment as a full exhibit, marked as plaintiffs' Exhibit 30.

At the conclusion of Federico's testimony, plaintiffs rested their case. The town thereafter moved for judgment as a matter of law pursuant to Rule 50 of the Superior Court Rules of Civil Procedure, noting that only plaintiffs' claims for continuing trespass (count three), negligence (count five), and unjust enrichment (count six) remained.

On the claim for continuing trespass, the town argued that there could be no continuing trespass after January or February 2017, when the town disconnected the line connecting the River Drive area to the Park Street line. The town also argued that Donatelli Building had actual and apparent authority to enter into an agreement conveying the Park Street line from JEA to the town, and that Donatelli Building did so in the agreement; accordingly, the town submitted that the town was in fact the owner of the Park Street line. The town alternatively asserted that it owned the Park Street line through a prescriptive easement. And, the town further contended that plaintiffs had failed to demonstrate any damages from the alleged trespass.

The trial justice ultimately denied the town's motion for judgment as a matter of law on plaintiffs' claims for trespass and unjust enrichment.[4]  He noted that there was evidence produced at trial that wastewater had flowed from a town line into the Park Street line.  He also indicated that there was a jury question as to who owned the Park Street line and whether sewage from a town line trespassed into the Park Street line and the Park Plaza pump station.  He therefore determined that there was competing evidence for the jury to decide on the issue of ownership of the Park Street line.

The defendants then called James Geremia, a civil engineer specializing in wastewater, wastewater treatment, and "anything mechanical to do with the wastewater industry[,]" who testified as an expert witness.  Geremia testified that he examined both the River Drive pump station and the Park Plaza pump station.  He indicated that there were two pumps in each pump station that would do alternate work, and that if both pumps came on at the same time there might be a problem in the system.  Geremia indicated that the Casali report was not clear on the size of the Park Street line, with one section saying it was a four-inch line and another saying it was a six-inch line; however, he testified that a plumbing report provided by plaintiffs stated that there was a six-inch flange, which confirmed for him that the

---

[4] The trial justice granted judgment as a matter of law on plaintiffs' claim of negligence on the basis that the cause of action did not relate back to the original complaint and was thus barred by the statute of limitations.

Park Street line was a six-inch line. Geremia acknowledged that several times the Casali report stated that the Park Street line was a four-inch line and a DiPrete Engineering report also stated it was a four-inch line.

Geremia noted that the DiPrete report stated that the River Drive pump station caused the Park Plaza pump station to run longer. However, according to Geremia's calculations, the Park Plaza pump station would run only an additional nine hours in a given year as a result of the connection to the River Drive pump station, and he testified that this amount of extra running time could not have caused a pump station to burn out. He also opined that rags or grease from the River Drive pump station did not contribute to the buildup of rags in the Park Street line. He indicated that the River Drive pump station would have had problems if this was occurring and the line connecting with the Park Street line would have been plugged up. Geremia also testified that he saw no evidence of a check-valve failure causing sewage to flow back into the Park Plaza pump station. According to Geremia, the size of the Park Street line could have caused the Park Plaza pump station to work too hard. He also testified that replacing three pumps in forty-five years was not unreasonable.

After the conclusion of Geremia's testimony, the town rested its case. The town then renewed its motion for judgment as a matter of law on the same grounds it had raised earlier. The trial justice again denied the town's motion with respect to plaintiffs' claims of trespass and unjust enrichment.

In their closing argument, plaintiffs requested that the jury award them almost $1.4 million in damages. Ultimately, the jury returned a verdict in favor of plaintiffs in the amount of $1.2 million. The jury specifically found that JEA owned the Park Street line and that the town did not have a prescriptive easement over the line. The jury further found that the town committed a continuing trespass on the Park Street line and the Park Plaza pump station and that the town's trespass proximately caused damages to plaintiffs above and beyond normal maintenance and repair costs.

The town thereafter renewed its motion for judgment as a matter of law and filed a motion for a new trial and/or remittitur. The trial justice heard the motions on April 15, 2019. As regards plaintiffs' trespass claim, the town reiterated its argument that, under the agreement, it owned the Park Street line. The town asserted that JEA did not have standing to contest the agreement and that, even if JEA had standing, the agreement was merely voidable, not void. The town further argued that Donatelli Building had apparent authority to enter into the agreement as a matter of law.

The plaintiffs argued that the agreement was void because Donatelli Building had no authority to transfer JEA's property. The plaintiffs asserted that Donatelli Building would have needed approval from the general partners to convey the Park Street line to the town. The plaintiffs also argued that they had standing to contest the agreement because Donatelli Building was purporting to act on JEA's behalf.

They also suggested that the issue of lack of standing based on the agreement should have been included in the jury instructions instead of being raised posttrial. The plaintiffs also noted that the jury did not reach their claim for unjust enrichment because it ruled in favor of plaintiffs on the trespass claim.

The trial justice granted the town's motion for judgment as a matter of law on plaintiffs' unjust-enrichment claim. He denied the motion for judgment as a matter of law on plaintiffs' trespass claim, stating that there was evidence on both sides of the issue as to who owned the Park Street line; therefore, the trial justice was not able to decide as a matter of law who owned the line.

The town additionally argued that it was entitled to a new trial; however, the trial justice determined that reasonable minds could differ on the evidence presented at trial, and therefore he ultimately denied the town's motion for a new trial. The town then asked, in the alternative, for a remittitur, which the trial justice denied based on the determination that the jury award did not shock the conscience.

The town thereafter raised the issues of public duty doctrine, the statutory cap on damages pursuant to § 9-31-3, and prejudgment interest. The trial justice found that the public duty doctrine did not apply because the town was liable for the tort of trespass just as a private individual would be liable for that tort. With regard to the statutory cap on damages, the trial justice determined that this case concerned the design of the sewer system and was therefore governmental in nature; thus, he

ultimately applied the $100,000 statutory cap and ruled that no prejudgment interest would apply. The trial justice, however, noted that, in the event that he was incorrect and the function was deemed to be proprietary, prejudgment interest should run from the date of the jury verdict.

Final judgment entered on June 10, 2019, in favor of plaintiffs in the statutory cap amount of $100,000, plus costs of $1,561.69. The plaintiffs filed a timely notice of appeal on June 13, 2019. The town filed a timely cross-appeal on June 19, 2019.

## II

## Discussion

### A

### Judgment as a Matter of Law

#### 1

#### Standard of Review

"Our review of a trial justice's decision on a motion for judgment as a matter of law is *de novo*." *McGarry v. Pielech*, 47 A.3d 271, 279 (R.I. 2012) (quoting *Medeiros v. Sitrin*, 984 A.2d 620, 625 (R.I. 2009)). "In reviewing a trial justice's decision on a motion for judgment as a matter of law, this Court is bound to follow the same rules and legal standards as govern the trial justice." *Roy v. State*, 139 A.3d 480, 488 (R.I. 2016) (quoting *Hough v. McKiernan*, 108 A.3d 1030, 1035 (R.I. 2015)). "The trial justice, and consequently this Court, must examine 'the evidence

in the light most favorable to the nonmoving party, without weighing the evidence or evaluating the credibility of witnesses, and draw from the record all reasonable inferences that support the position of the nonmoving party.'" *Hough*, 108 A.3d at 1035 (brackets omitted) (quoting *Perry v. Alessi*, 890 A.2d 463, 467 (R.I. 2006)).

Judgment as a matter of law should be entered "when the evidence permits only one legitimate conclusion in regard to the outcome." *Hough*, 108 A.3d at 1035 (quoting *Long v. Atlantic PBS, Inc.*, 681 A.2d 249, 252 (R.I. 1996)).  "However, the trial justice must deny the motion and submit the issues to the jury if there are factual issues on which reasonable people may draw different conclusions." *Medeiros*, 984 A.2d at 625.  We have previously held "that we will overturn a trial justice's decision granting a motion for judgment as a matter of law when the trial justice has 'invaded the province of the jury by impermissibly finding facts.'" *Franco v. Latina*, 916 A.2d 1251, 1263 (R.I. 2007) (quoting *Martino v. Leary*, 739 A.2d 1181, 1183 (R.I. 1999)).

**2**

**Standing and Voidability**

The town first claims that JEA lacks standing to challenge the agreement because it was not a party to the agreement—indeed, the agreement was between the town and Donatelli Building.  The town further avers that its argument with respect to standing is not waived on appeal, despite the issue not having been raised in its answer to plaintiffs' second-amended complaint, because, the town argues, standing

is not one of the affirmative defenses identified in Rule 8(c) of the Superior Court Rules of Civil Procedure that must be presented in an answer. The town further indicates that it is not suggesting that JEA lacks standing to bring a trespass claim; rather, it is arguing "that the [s]ewer [a]greement defeats any claim of trespass." Moreover, the town notes that JEA's second-amended complaint does not cite the agreement in support of its trespass claim, nor has JEA brought suit under the agreement. The town avers that JEA's alternative argument that it has standing as the owner of the Park Plaza Apartments "misses the point" because, according to the town, there was no construction contract with Donatelli Building that "establishes ownership of the sewer line itself."

The town alternatively contends that, if JEA demonstrates that the agreement should be voided as a result of Donatelli Building's lack of authority, the town "was entitled to act pursuant to [the agreement] until [JEA] exercised its right to void the contract." Simply put, the town contends that the contract was voidable, not void, and that JEA never voided the contract.

JEA, for its part, contends that the town has waived the right to raise the issues of standing and voidability because it failed to plead them as affirmative defenses in its answer to plaintiffs' second-amended complaint. JEA also argues that, even if the defenses are not waived, the fact remains that JEA has standing to challenge the agreement because (1) JEA had a personal stake in the outcome of the controversy

surrounding the ownership of the Park Street line, and (2) the town's actions caused JEA injury in fact. JEA highlights that Donatelli Building was JEA's general contractor and was acting only as JEA's agent in procuring permits and performing the construction of the apartment complex. Thus, JEA argues, the contract was void, as opposed to voidable. Additionally, JEA argues that the sole purpose of the agreement was for JEA's benefit to "enable the discharge sewage produced by Park Plaza into the [t]own's municipal sewer system in Atwood Avenue[,] and that [s]uch circumstances render JEA, as owner/developer, an intended third-party beneficiary of the [agreement]," thus giving JEA the ability to challenge the contract.

We begin by recognizing that standing and voidability are not waived if a party fails to properly raise the defenses in its answer. *See Christy's Auto Rentals, Inc. v. Massachusetts Homeland Insurance Company*, 204 A.3d 1071, 1075 (R.I. 2019) ("It is patently clear that standing is not specifically listed in Rule 8(c) as an affirmative defense that is considered to be waived if not presented in a motion, answer, or reply in accordance with Rule 12(h)."). We have held, however, that "standing can be waived by a party's failure to raise the issue before the trial justice[.]" *Costa v. Silva*, 996 A.2d 607, 611 n.4 (R.I. 2010). Voidability, likewise, is not listed in the relevant rule as an affirmative defense. *See* Super. R. Civ. P. 8(c). In the case at bar, the town asserted the issue of voidability and maintained that JEA lacked standing to contest the agreement at the hearing on the town's renewed

motion for judgment as a matter of law. Accordingly, the town has not waived the issues of standing and voidability.

"Standing is a threshold inquiry into whether the party seeking relief is entitled to bring suit." *Cruz v. Mortgage Electronic Registration Systems, Inc.*, 108 A.3d 992, 996 (R.I. 2015) (quoting *Narragansett Indian Tribe v. State*, 81 A.3d 1106, 1110 (R.I. 2014)). When dealing with the issue of standing, "the court must focus 'on the party who is advancing the claim rather than on the issue the party seeks to have adjudicated.'" *N & M Properties, LLC v. Town of West Warwick ex rel. Moore*, 964 A.2d 1141, 1145 (R.I. 2009) (quoting *Bowen v. Mollis*, 945 A.2d 314, 317 (R.I. 2008)). The inquiry of whether a party has standing "begins with the pivotal question of whether the party alleges that the challenged action has caused him or her injury in fact." *Cruz*, 108 A.3d at 996 (quoting *Narragansett Indian Tribe*, 81 A.3d at 1110). An injury in fact must be "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Pontbriand v. Sundlun*, 699 A.2d 856, 862 (R.I. 1997) (deletion omitted) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

We have previously rejected the notion that "an individual who is not a party to a contract may assert the rights of one of the contracting parties in order to void a contract or have it declared unenforceable." *Cruz*, 108 A.3d at 996 (quoting *Sousa v. Town of Coventry*, 774 A.2d 812, 815 n.4 (R.I. 2001)). We have also long

recognized "that a void contract is a nullity, but that a voidable contract affects only one party and 'may be either ratified or rescinded at that party's election.'" *Id.* at 997 (quoting *Moura v. Mortgage Electronic Registration Systems, Inc.*, 90 A.3d 852, 857 (R.I. 2014)). Thus, as a general rule, a person who is not a party to a contract may have standing to challenge the contract as void, but lacks standing to claim that the contract is merely voidable. *Id.*

In *Cruz,* we adopted the First Circuit's reasoning that "[a] void contract is one that cannot be enforced," and that "a challenge to a mortgage assignment on the ground that the assignor 'never possessed a legally transferrable interest' alleges a void, as opposed to voidable, assignment." *Cruz*, 108 A.3d at 997 (quoting *Wilson v. HSBC Mortgage Services, Inc.*, 774 F.3d 1, 10 (1st Cir. 2014)).

Although the trial justice did not directly address the issues of standing and voidability when rendering his decision on the town's renewed motion for judgment as a matter of law, he did note that both parties had introduced testimony as to who owned the Park Street line, thus indicating that the issue of ownership was not appropriate for judgment as a matter of law. We find no evidence produced by the town in the record suggesting that Donatelli Building held either title to the property or an interest in the Park Street sewer line that it purported to convey to the town, which would have resulted in Donatelli Building possessing a legally transferrable interest.

Although Tapalian acknowledged on cross-examination that, with respect to the Park Plaza construction project, Donatelli "did everything" as a result of Tapalian working on other projects, he also further asserted that this did not mean that, as the contractor, Donatelli "ha[d] the authority to sign [over] assets of [Tapalian] or [the] limited partners to anybody." Tapalian testified that he had no knowledge of the agreement until the initiation of the lawsuit. The town has presented no evidence that suggests that the town ever acted as the owner of the Park Street line pursuant to the agreement; and, despite Tapalian acknowledging that the sewer line was put in underneath town-owned Park Street, Tapalian also testified that the town did not maintain or repair the Park Street line and never ordered JEA to stop working on the line when the town became aware of the problems prior to the lawsuit filed by JEA.

Viewing the evidence in the light most advantageous to JEA and drawing all reasonable inferences in its favor, as we must, we are satisfied that JEA had standing to challenge the agreement.

**3**

**Apparent Authority**

The town argues that, even if JEA had standing to challenge the validity of the agreement, Donatelli Building had apparent authority to enter into the agreement. Although the partnership agreements in evidence do address Donatelli Building's

lack of actual authority to act on behalf of JEA, the town asserts that Donatelli Building had apparent authority under Rhode Island law. The town emphasizes that Donatelli Building possessed an indicia of authority "in working with the [t]own to complete the [c]omplex."

The plaintiffs assert that the jury properly concluded that Donatelli Building did not have apparent authority to transfer ownership of the Park Street line to the town. The plaintiffs emphasize the evidence presented at trial that (1) Donatelli Building was hired only as a general contractor; (2) Tapalian was JEA's only general partner; and (3) Donatelli Building was only a 1 percent limited partner, and was only made so "for the limited purpose of having an 'identity of ownership' with the owner as required by the FHA to procure the requisite financing." The plaintiffs underscore that, according to Tapalian's testimony at trial, Donatelli Building was never given authority to transfer the Park Street line and JEA never represented to the town that Donatelli Building had such authority. The plaintiffs note that the town never claimed ownership of the Park Street line until this lawsuit, and JEA's ownership of the line was never questioned by the town prior to, during, or in the years after the construction of the Park Plaza Apartments. In addition, plaintiffs state that it was undisputed that, for over thirty years, JEA provided the exclusive maintenance and care of the Park Street line, and consequently, the town provided "no such care or support."

"Apparent authority to contract on behalf of a principal 'arises from the principal's manifestation of such authority to the third party.'" *731 Airport Associates, LP v. H & M Realty Associates, LLC ex rel. Leef*, 799 A.2d 279, 283 (R.I. 2002) (brackets omitted) (quoting *Menard & Co. Masonry Building Contractors v. Marshall Building Systems, Inc.*, 539 A.2d 523, 526 (R.I. 1988)). "[A]pparent authority can come from 'indicia of authority given by the principal to the agent' and does not have to be direct communication to the third person." *Id.* (quoting *Menard & Co.*, 539 A.2d at 526). The third party "must 'believe that the agent has the authority to bind its principal to the contract.'" *Id.* (quoting *Menard & Co.*, 539 A.2d at 526).

In denying the town's motion for judgment as a matter of law, the trial justice stated, "There is some very, very competing evidence on [the issues of ownership and apparent authority] in * * * an agreement purported[ly] signed by Donatelli, his limited partnership, [and] the public documents with relation to that particular business entity." The trial justice elaborated on this reasoning when denying the town's renewed motion for judgment as a matter of law. The trial justice explained:

> "[T]here are two partnership agreements. One of them—the latter one being the amended partnership agreement. Mr. Tapalian testified there is no authority to give [the force main] to the [t]own. Donatelli did not have the authority. It has been argued that there is apparent authority, and there was testimony from Mr. Tapalian that he was tied up with other projects, and he left this to Mr. Donatelli with regard to the construction of the force main

- 28 -

on Park Street.  But it was clear that [JEA] would maintain this particular line for years and years and years.

"* * *

"* * * Mr. Tapalian testified, and he was subject to cross-examination, that notwithstanding Donatelli's status, he had no authority to bind the partnership agreement or the partnership, Johnston Equities, to the [t]own with that particular agreement."

Overall, the trial justice observed that "[t]here was evidence on both sides of this particular equation" regarding the issue of apparent authority.  He stated: "The [c]ourt simply as a matter of law is unable to rule that the [t]own is entitled to a judgment as a matter of law notwithstanding the [jury] instructions, testimony, and the particular exhibits that exist in the totality of what transpired * * * in the Superior Court during this trial."

Without weighing the evidence or evaluating the credibility of witnesses, we expand on what the trial justice stated and further highlight the competing evidence presented by plaintiffs.  We conduct this exercise only to underscore our view that the trial justice did not err in denying the town's motions for judgment as a matter of law.  At trial, Tapalian testified that Donatelli was never a general partner to the original or amended partnership agreements.  This is of particular importance because Tapalian confirmed that only the general partners of JEA, not the limited partners, were authorized to convey property under the partnership agreements, and only if there was notice given to and approval received from the limited partners and

the Federal Housing Administration. Tapalian's testimony was corroborated by the language and terms of the partnership agreements themselves.

Tapalian further testified that Donatelli Building was a 1 percent limited partner and contributed $50 to the capital of the partnership. Tapalian stated that Donatelli Building was hired as the general contractor to build the apartment complex and that it obtained the permits necessary to construct the complex. He indicated that the general partners never (1) agreed to transfer ownership of the Park Street line; (2) provided Donatelli Building with permission to do so; or (3) told the town or took any other action that "even remotely * * * advise[d] the [t]own" that Donatelli Building had authorization or permission to transfer the line.

When viewing this in the light most favorable to plaintiffs, and drawing all reasonable inferences in plaintiffs' favor, it is clear that a reasonable jury could determine that Donatelli Building did not have the requisite apparent authority to transfer ownership of the Park Street line to the town. Thus, we are satisfied that the trial justice did not err when he denied the motion for judgment as a matter of law as well as the renewed motions for judgment as a matter of law as to the issue of apparent authority.

**4**

**Prescriptive Easement**

Next, the town contends that, even if the agreement was void, the evidence shows that the town possessed a prescriptive easement over the Park Street line. The town asserts that all three elements of a prescriptive easement were satisfied, in that (1) the ten-year requirement "was demonstrated by the undisputed evidence that the River Drive line was connected [to the] Park Street line over thirty * * * years ago, sometime in the 1980s"; (2) the open and notorious elements were "demonstrated through the LaFazia Manor Plan and D'Ercole Easement documents";[5] and (3) the hostile requirement was demonstrated "through [JEA's] own claim that it never granted the [t]own the authority to connect any additional lines to the Park Street force main but yet the connection was made and the sewerage flowed through the Park Street force main." To the contrary, plaintiffs argue that the town "failed to prove by clear and convincing evidence the 'open and notorious' elements of its prescriptive easement defense."

---

[5] The "LaFazia Manor Plan" is a plan of LaFazia Manor dated June 1979 and is a public record filed with the Johnston Planning Department. The "D'Ercole Easement" is an agreement, bearing a date of May 1970, that, according to Tapalian, purports to grant an easement for a sewer line running across the river to tie into the Park Street sewer main. It is recorded in the Land Evidence Records for the Town of Johnston.

- 31 -

Similar to the issue of apparent authority, we are of the opinion that the town was not entitled to judgment as a matter of law on its assertion that the town had acquired a prescriptive easement over the Park Street line. "It is well established that 'a claimant of an easement by prescription must show actual, open, notorious, hostile, and continuous use under a claim of right for at least ten years.'" *Gianfrancesco v. A.R. Bilodeau, Inc.*, 112 A.3d 703, 710 (R.I. 2015) (brackets omitted) (quoting *Butterfly Realty v. James Romanella & Sons, Inc.*, 93 A.3d 1022, 1030 (R.I. 2014)). "[A] claim of right may be proven through evidence of open, visible acts or declarations, accompanied by use of the property in an objectively observable manner that is inconsistent with the rights of the record owner." *Tavares v. Beck*, 814 A.2d 346, 351 (R.I. 2003).

At trial, when deciding the motion for judgment as a matter of law, the trial justice merely stated that "[o]wnership * * * is up in the air[,]" and that there was competing evidence from plaintiffs. Although the trial justice did not provide great detail as to his reasoning for denying the motions on the issue of whether the town possessed a prescriptive easement to utilize the Park Street line, we are of the opinion that the trial justice did not err in denying the motions as they pertained to the issue.

Assuming, without deciding, that the town had satisfied all the other elements of a prescriptive easement claim, we are unconvinced that the town proved by "clear and convincing evidence," *Gianfrancesco*, 112 A.3d at 710, the open and notorious

elements of its prescriptive easement defense. The town contends that the open and notorious requirement was demonstrated through the LaFazia Manor Plan and D'Ercole Easement documents. The plaintiffs counter this by arguing that the LaFazia Manor Plan does not reflect the River Drive line's connection to the Park Street line.

While the town points to Tapalian's testimony that the easement agreement seems to grant an easement to Park Street and tie into JEA's Park Street line, we do not view the easement agreement as openly depicting the prescriptive easement. The easement agreement appears to make no mention of Park Street. Moreover, the easement agreement states only that the grantor conveyed "an easement to lay a sewer line to Centre Street across the northerly five * * * feet in width by the entire depth[,]" and then goes on to describe the parcel of land upon which the easement exists. Again, however, no reference to Park Street can be found in the agreement.

The plaintiffs also highlight the other evidence presented at trial. Namely, plaintiffs emphasize that there was evidence that the town was not even aware that the illicit sewer line connecting River Drive to the Park Street line existed. Iascone testified that the town's engineer, Lorri Caruso, was "baffled" when she learned of the sewer line connection because the River Drive line was supposed to "go up River Drive hill and tie into Plainfield Street." There is also a 2012 memorandum from the town's engineer to the town council, Exhibit 26 at trial, that stated that there had

been a request for proposals to commission a study of "the sanitary sewer system serving the River Drive and South Bennett/La[F]azia sewer pump stations[.]" The memorandum explained that the town needed "accurate records of the sanitary sewer in that area that [they did] not have[.]" The plaintiffs argue that this coincides with the town's "Sewer Facilities Plan" on file with the Department of Environmental Management, which depicts the same plan as the plan that Caruso described when she learned of the town's sewer line connection to the private Park Street line.

Upon consideration of the evidence presented by plaintiffs and viewing such evidence in the light most favorable to plaintiffs, while drawing all reasonable inferences in their favor, we are unpersuaded that the town presented sufficient evidence that it used the Park Street line in an objectively observable manner such that its use was open and notorious.

Accordingly, the trial justice did not err in denying both the town's motion for judgment as a matter of law and the town's renewed motions for judgment as a matter of law.[6]

---

[6] Because we affirm the trial justice's denial of the town's renewed motion for judgment as a matter of law, we need not reach plaintiffs' argument that the trial justice erred in granting the town's motion for judgment as a matter of law as to plaintiff's negligence claim.

# B

## Statutory Tort Cap, Public Duty Doctrine, and Prejudgment Interest

### 1

### Standard of Review

"This Court reviews pure questions of law under a *de novo* standard." *Roach v. State*, 157 A.3d 1042, 1048 (R.I. 2017).

### 2

### Statutory Tort Cap

This Court has previously observed that "Rhode Island operates under a general statutory-damage limitation applicable in tort cases asserted against the state." *Roach*, 157 A.3d at 1052. The relevant statute provides:

> "In any tort action against any city or town or any fire district, any damages recovered therein shall not exceed the sum of one hundred thousand dollars ($100,000); provided, however, that in all instances in which the city or town or fire district was engaged in a proprietary function in the commission of the tort, the limitation of damages set forth in this section shall not apply." Section 9-31-3.

Thus, this Court recognizes that damages above $100,000 are permitted when the tort action stems from a city or town's engagement in a proprietary function. *See Roach*, 157 A.3d at 1052. "'Proprietary' functions are those 'actions normally performed by private individuals.'" *Id.* (quoting *Graff v. Motta*, 695 A.2d 486, 489

(R.I. 1997)). "Alternatively, this Court has defined a 'proprietary function' as 'one which is not so intertwined with governing that the government is obligated to perform it only by its own agents or employees.'" *Id.* (quoting *Lepore v. Rhode Island Public Transit Authority*, 524 A.2d 574, 575 (R.I. 1987)).

On appeal, plaintiffs submit that the trial justice erred in applying the $100,000 statutory cap because, they contend, the operation of a municipal sewer system is a proprietary function and, therefore, the town should not have been shielded from liability. Specifically, plaintiffs argue that the trial justice mischaracterized the issue as one of design, which is a governmental function, rather than one of operation, a proprietary function. In support of their argument, plaintiffs indicate that this Court in *Rotella v. McGovern*, 109 R.I. 529, 288 A.2d 258 (1972), "acknowledged that the operation of a municipal sewer system constitutes a proprietary function[.]" The plaintiffs additionally contend that the statutory cap does not apply because plaintiffs' claims relate to the town's operation of its municipal sewer system, not its design. They further assert that the town cannot claim that it did not know about the sewer line connection to Park Street while at the same time asserting that the connection was part of the town's design.

This Court has indicated that a municipality cannot be held liable for the design of a sewer system. *See King v. Granger*, 21 R.I. 93, 98, 41 A. 1012, 1014 (1898). In *Granger*, this Court said:

"For any error in judgment on the part of the city authorities in devising and adopting a plan for taking care of the surface water and sewage of a given district, or of the city as a whole, many, and perhaps a majority, of the courts, hold that no responsibility exists, as, in so doing, the city is exercising a legislative or quasi judicial power, and not discharging a merely ministerial duty. *But having once adopted a given plan, and constructed the sewers in accordance therewith, the judicial discretion ends, and the ministerial duty begins*; and, like an individual, it then ordinarily becomes liable for damages to others resulting from the negligent discharge of, or the negligent omission to discharge, such duty." *Id.* at 98, 41 A. at 1014 (emphasis added).

Under *Granger*, the design and construction of a municipal sewer system is a governmental function; in contrast, the actions and maintenance that come after the sewer is completed appear to be proprietary. *See id.*; *see also Rotella*, 109 R.I. at 532-33, 288 A.2d at 260 (observing that the city did not contest the trial justice's determination that operation of a sewer system constitutes a proprietary function likely because of past holdings by the Court); *Prete v. Cray*, 49 R.I. 209, 211, 141 A. 609, 611 (1928) (holding that a municipality acts in a corporate, not governmental, capacity in maintaining a sewer system). We are therefore of the opinion that the operation of a sewer system is a proprietary function.

After reviewing the entire record, we conclude that the town's function in this case is not one of design or plan, as the town submits in support of its opposition to plaintiffs' appeal from the trial court's imposition of the statutory cap on damages. Although the trial justice found that the town intended to connect the Park Street line

- 37 -

with the town sewer system, the testimony and exhibits submitted at trial show that the town in fact was unaware of the connection until 2010. The record is additionally devoid of any evidence identifying who connected the River Drive line to the Park Street line. Furthermore, plans submitted by plaintiffs indicate that the River Drive line was connected to the Park Street line in contravention of the plan for the River Drive line to run easterly towards the town's existing gravity sewer lines. Indeed, the maps and testimony establish that there was never a plan for the town to tie into the Park Street line. It is therefore clear that the town did not engage in the design or plan of that segment of the sewer system, because the town submitted no evidence that it planned to connect, or actually performed the action of connecting, the River Drive line to the Park Street line.

Furthermore, plaintiffs' trespass claim is based on the unauthorized *use* of JEA's Park Street line, namely the additional discharge of sewage by the town into the Park Street line for over thirty years, and the resulting damage. The town, by allowing its sewage to flow into plaintiffs' private line, wrongfully *operated* the town's sewage system. Having determined that the operation of a sewer is a proprietary function, the statutory cap is not applicable. *See Rotella*, 109 R.I. at 532-33, 288 A.2d at 260; *see also* § 9-31-3.

Accordingly, because the trial justice erred in classifying the function at issue as one of design rather than of operation, we conclude that the trial justice erred in applying the statutory cap on damages to the jury verdict in this case.

**3**

**Public Duty Doctrine**

The town argues on cross-appeal that it is entitled to immunity under the public duty doctrine. The plaintiffs argued before the Superior Court that the public duty doctrine does not apply because the town was engaged in the "proprietary function" of operating its municipal sewer system. The town, however, asserts that the standard for applying the public duty doctrine is not based on the distinction between proprietary and governmental functions. Rather, the town contends that the question turns on whether the state and its political subdivisions performed discretionary actions that are not ordinarily performed by private persons. Specifically, the town asserts that "organizing the town-wide plan for the sewer system and coordinating the sewer lines from various developments is not a function normally performed by a private individual." The town claims that "it is a discretionary function that the [t]own provides to coordinate the entire system rather than service a single development."

We begin by noting that "[t]he General Assembly has mandated, by virtue of G.L. 1956 § 9-31-1, that the state should be liable in all actions of tort in the same

- 39 -

manner as a private individual or corporation, subject to certain monetary limitations. Through its enactment of § 9-31-1, the General Assembly effectively abolished the prior common law rule of sovereign immunity." *Adams v. Rhode Island Department of Corrections*, 973 A.2d 542, 545 (R.I. 2009). The public duty doctrine is a narrow exception carved out by this Court to the general rule of state liability. *See id.*

"[T]he public-duty doctrine immunizes the state from 'tort liability arising out of discretionary governmental actions that by their nature are not ordinarily performed by private persons.'" *Roach*, 157 A.3d at 1050 (brackets omitted) (quoting *Morales v. Town of Johnston*, 895 A.2d 721, 730 (R.I. 2006)). "[I]mmunity enjoyed by state and municipal governments is applicable to governmental functions, except in three situations: '(1) when the governmental entity owes a special duty to the plaintiff, (2) when the alleged act or omission on the part of the governmental entity was egregious, or (3) when the governmental entity engaged in activities normally undertaken by private individuals or corporations.'" *Schultz v. Foster-Glocester Regional School District*, 755 A.2d 153, 155 (R.I. 2000) (quoting *Kuzniar v. Keach*, 709 A.2d 1050, 1053 (R.I. 1998)). Therefore, "[w]hen the state engages in an activity that a private individual typically would not perform, such as the maintenance of state highways or the issuance of state drivers' licenses, the public duty doctrine will shield the state from liability." *Martinelli v. Hopkins*, 787

A.2d 1158, 1167 (R.I. 2001) (quoting *Longtin v. D'Ambra Construction Co.*, 588 A.2d 1044, 1046 (R.I. 1991)).

"The underlying purpose of the public-duty doctrine is to encourage the effective administration of governmental operations by removing the threat of potential litigation." *Martinelli*, 787 A.2d at 1167 (quoting *Misurelli v. State, Department of Transportation*, 590 A.2d 877, 878 (R.I. 1991)). The town, therefore, correctly articulates that our analysis under the public duty doctrine turns on whether the town was engaged in "discretionary" governmental activities or an act capable of performance and ordinarily performed by private citizens. *See Roach*, 157 A.3d at 1051.

Notably, in making a decision regarding the public duty doctrine in the case at bar, the trial justice indicated that he was persuaded by the town's "design argument" and that "[t]he case is enough to make a finding [that] there is a governmental function here." However, he ultimately found that the public duty doctrine did not apply, observing that the doctrine is "nuanced."

We commend the trial justice for the genteel manner in which he described our public duty jurisprudence. We recognize the somewhat murky nature of deciphering the applicability of the public duty doctrine. In *Adams*, cited *supra*, we clarified that our inquiry turns on the "actual government function at issue in the

case" and whether it "is an activity that business entities and private persons can and do perform regularly." *Adams*, 973 A.2d at 546.

"Put most simply, 'when we analyze whether an activity would be performed by a private person so as to bring it within the provisions of § 9-31-1 we inquire whether this is an activity that a private person or corporation would be likely to carry out. If the answer is affirmative, then liability will attach.'"[7] *Adams*, 973 A.2d at 546 (alterations omitted) (quoting *O'Brien v. State*, 555 A.2d 334, 338 (R.I. 1989)). "[U]nder our analysis of the public-duty doctrine, we differentiate between 'discretionary' governmental activities and acts capable of performance by private citizens." *Roach*, 157 A.3d at 1051.

Because we have already determined that the function at issue in this case is not governmental in nature, namely the design or plan of the town's sewer system, but rather it was the town's unauthorized use of JEA's Park Street line—specifically the town's wrongful operation in allowing town sewage to flow into the privately owned Park Street line—we need go no further. The operation of a sewer system is an activity that can be performed by private individuals. Indeed, JEA had operated, maintained, and repaired its own private sewer system for over forty years.

---

[7] General Laws 1956 § 9-31-1(a) states, in relevant part: "The state of Rhode Island and any political subdivision thereof, including all cities and towns, shall * * * hereby be liable in all actions of tort in the same manner as a private individual or corporation[.]"

- 42 -

Accordingly, we conclude that the trial justice did not err in finding that the public duty doctrine was inapplicable.

**4**

**Prejudgment Interest**

Having determined that the town was engaged in a proprietary function and, additionally, that the public duty doctrine does not apply to the case at bar, we turn next to the issue of prejudgment interest. On appeal, plaintiffs contend that prejudgment interest should have been added to the damages award because the town was performing a proprietary function.

Section 9-31-3 "does not place a limit on the amount of damages recoverable in the instant action because the government is performing a proprietary function." *Roach*, 157 A.3d at 1055 (quoting *Lepore*, 524 A.2d at 575). As a result, prejudgment interest would be appropriate to award in this case because, as we have determined, the town was performing a proprietary function. *See id.* ("As the statutory tort cap is inapplicable, the state, like any private person, is subject to prejudgment interest."). "Whenever a verdict is rendered or decision made for pecuniary damages, the interest is payable 'from the date the cause of action accrued.'" *Grady v. Grady*, 504 A.2d 444, 448 (R.I. 1986) (quoting G.L. 1956 § 9-21-10). However, if it is impossible to determine the date of accrual of the cause of action, prejudgment interest may be denied. *Id.*

In their brief, plaintiffs submit three alternate dates from which they contend prejudgment interest should run: (1) sometime in 1981, when JEA claims the town first began to discharge municipal sewage into the Park Street line; (2) the beginning of 1983, when JEA first began suffering damages; or (3) at the very latest, May 12, 2011, when JEA submitted its presentment letter to the town council for damages based on the town's trespass upon the Park Street line.

In the event that this Court should find that the town's function was proprietary, the trial justice determined that prejudgment interest would run from the date of the jury verdict in this case, noting that the amount of damages was not a set amount as of January 1, 1983.

It strikes us as just that, because the time the town began trespassing is unclear from the record, interest should run from May 12, 2011, when JEA submitted its presentment letter to the town council. At that point, the town was explicitly made aware of the town's improper connection to the Park Street line and was presented with a monetary demand for damages sustained by JEA due to the connection. Accordingly, we hold that the trial justice erred in denying prejudgment interest; we conclude that prejudgment interest should be awarded as of May 12, 2011. Thus, prejudgment interest should be calculated in accordance with § 9-21-10 as of that date.[8]

---

[8] General Laws 1956 § 9-21-10(a) provides that

## C

## Motion for a New Trial and/or Remittitur

## 1

## Standard of Review

"It is well settled that our review of a trial justice's decision on a motion for a new trial is deferential." *Heneault v. Lantini*, 213 A.3d 410, 415 (R.I. 2019) (quoting *Letizio v. Ritacco*, 204 A.3d 597, 602 (R.I. 2019)). This Court has often stated that, "when ruling on a motion for a new trial in a civil case tried to a jury, the trial justice acts as a superjuror and should review the evidence and exercise [the trial justice's] independent judgment in passing upon the weight of the evidence and the credibility of the witnesses." *Hough v. McKiernan*, 101 A.3d 853, 856 (R.I. 2014) (brackets omitted) (quoting *Connor v. Schlemmer*, 996 A.2d 98, 114 (R.I. 2010)). Although the trial justice undertakes an "independent appraisal of the evidence in light of [the trial justice's] charge to the jury[,]" *Heneault*, 213 A.3d at 415 (quoting *Letizio*, 204 A.3d at 602), the trial justice "need not engage in an exhaustive review and analysis of the evidence and testimony presented at trial but need only make reference to such

---

"[i]n any civil action in which a verdict is rendered or a decision made for pecuniary damages, there shall be added by the clerk of the court to the amount of damages interest at the rate of twelve percent (12%) per annum thereon from the date the cause of action accrued, which shall be included in the judgment entered therein."

facts disclosed by the testimony as have motivated [the trial justice's] conclusion." *Hough*, 101 A.3d at 856 (alterations omitted) (quoting *Bourdon's, Inc. v. Ecin Industries, Inc.*, 704 A.2d 747, 758 (R.I. 1997)).

"If, after conducting this analysis, the trial justice concludes that the evidence is evenly balanced or that reasonable minds could differ on the verdict, [the trial justice] should not disturb the jury's decision." *Heneault*, 213 A.3d at 415 (quoting *Letizio*, 204 A.3d at 602). "If the trial justice has performed this task, then [the trial justice's] decision will not be disturbed unless the [party] can show that the trial justice overlooked or misconceived material and relevant evidence or was otherwise clearly wrong." *Id.* (quoting *Letizio*, 204 A.3d at 602). "However, with respect to a motion for a new trial on questions concerning an alleged error of law, our review is *de novo*." *Id.* (quoting *Berman v. Sitrin*, 101 A.3d 1251, 1260 (R.I. 2014)).

"Generally, the admissibility of evidence is within the sound discretion of the trial justice[.]" *Cappuccilli v. Carcieri*, 174 A.3d 722, 729 (R.I. 2017) (quoting *Martin v. Lawrence*, 79 A.3d 1275, 1281 (R.I. 2013)). "This Court will not interfere with the trial justice's decision unless a clear abuse of that discretion is apparent." *Id.* (brackets omitted) (quoting *Berman*, 101 A.3d at 1259).

"[A] remittitur may be accomplished if the trial justice concludes, after passing upon the evidence, that the plaintiff is not entitled to such an award or that

the award is unreasonable in light of the evidence presented at trial." *Hough*, 101 A.3d at 856 (quoting *Reccko v. Criss Cadillac Co.*, 610 A.2d 542, 546 (R.I. 1992)). "The trial justice may reject the award or order a remittitur of the award if it shocks the conscience or it clearly appears to be excessive, or to represent the passion and prejudice of the jury rather than their unbiased judgment." *Id.* (quoting *Reccko*, 610 A.2d at 546).

**2**

**Damages Assessment**

The town first argues that the trial justice erred in denying its motion for a new trial because, the town contends, the jury did not base its verdict on the evidence presented at trial. Rather, the town claims that the jury based the damage award on plaintiffs' counsel's closing argument. Specifically, the town asserts that "although the damage award mimicked [p]laintiffs' [c]ounsel's closing argument, there was no evidentiary support for [c]ounsel's figures." The town suggests that the figures proffered by plaintiffs' counsel during its closing were inflated by "over 40 [percent]."

The town extensively discusses the various examples of plaintiffs' alleged mathematical errors and misrepresentations, including plaintiffs' counsel's argument that (1) the University Industries invoices totaled approximately $313,000, when the summary of the invoices showed only $212,000; and (2) "other

documents" and "other invoices" amounted to roughly $200,000, but calculations of the charges listed by plaintiffs totaled only $103,135.75. Moreover, the town takes issue with plaintiffs' counsel's representation that Iascone "testified [that, since 1984,] he was paid on average of about $80,000 a year for the work performed at Park Plaza[,]" because, the town asserts, there was no evidentiary support for this statement. The plaintiffs counter that "the [j]ury was provided with reliable, probative[,] and credible documentary evidence on damages[,]" which was then explained through witness testimony.

"Damages do not have to be calculated with mathematical exactitude; all that is required is that they are based on reasonable and probable estimates." *Butera v. Boucher*, 798 A.2d 340, 350 (R.I. 2002). "Damages will not be denied merely because they are difficult to ascertain." *Morabit v. Hoag*, 80 A.3d 1, 15 (R.I. 2013) (brackets omitted) (quoting *Marketing Design Source, Inc. v. Pranda North America, Inc.*, 799 A.2d 267, 273 (R.I. 2002)).

Based on the evidence and testimony presented at trial, the trial justice determined that reasonable minds could have reached different conclusions on the issue of damages. The trial justice stated that he was "aware * * * that there was a search for records" dating back to the late 1970s, and he was "aware of the state of the records that came out during the trial." However, the trial justice also recognized that there was an "exceptional cross-examination with regard to the lack of

specificity within [the] particular bills." The trial justice further mentioned that, in addition to the testimony by Tapalian, Iascone, and D'Ambra, Federico's testimony demonstrated that 83 percent of the flow of sewage was attributable to the town, and therefore 83 percent of plaintiffs' claims are attributable to the town.

Although he admits that he may have decided the matter differently, i.e., "adjusted [the] verdict downward as the super juror" by giving more weight to the town's cross-examination of plaintiffs' witnesses, the trial justice stressed that he did not believe that the verdict failed to do justice or to truly respond to the merits of the case. He further noted that he had told the jury that counsel statements were not evidence, and that they should determine whether there was evidence in the case and on the record to support an award of damages. Finally, the trial justice highlighted that the jury verdict of $1.2 million was approximately $200,000 short of what plaintiffs had requested.

We are satisfied that the trial justice conducted the correct analysis in denying the motion for a new trial on this issue. Our review of the record shows that the trial justice sufficiently discussed the evidence for this Court to determine that he did not "overlook or misconceive material evidence, and [was] not otherwise clearly wrong" in deciding the issue. *Bitgood v. Greene*, 108 A.3d 1023, 1028 (R.I. 2015) (quoting *Connor*, 996 A.2d at 115).

- 49 -

## 3

## Causation

The town also argues that a new trial should have been granted because "the evidence at trial was grossly insufficient to support a causal link between the perceived trespass and [p]laintiffs' damages." The plaintiffs counter this argument by asserting that the jury had "more than sufficient information" to find that the town's trespass proximately caused the damages to plaintiffs.

The town asserts that Federico's opinion that the town damaged the Park Plaza sewer system was not based on inspection of the pumps; rather, the town contends, Federico based his opinion on the "fact that the lines that fed into the River Drive station had significant debris and grease." The town argues that Federico (1) admitted that he was unaware that D'Ambra "had jetted the Park Street line on a yearly basis since 1996"; (2) testified that he never inspected the pumps that were burned out; (3) admitted that he did not know the reason why the pumps burned out; and (4) did not know how many of the Park Street pumps had burned out or needed to be replaced over the past forty years. Further, the town notes that Iascone testified that he never noticed any rags in the pump station and that the debris was minimal. The town also emphasizes that Federico admitted to not reviewing the town's maintenance records for the River Drive pump station. Federico further conceded that functional issues, such as the ones claimed by plaintiffs, "happen all the time in

pump stations[,]" and that the Park Plaza pump station did not meet the velocity flow rate required under a TR16 standard.[9]

"To prove proximate cause, a plaintiff must establish the required causal relationship by competent evidence." *Almonte v. Kurl*, 46 A.3d 1, 18 (R.I. 2012). "In most cases, proximate cause is established by showing that but for the negligence of the tortfeasor, injury to the plaintiff would not have occurred." *Skaling v. Aetna Insurance Co.*, 742 A.2d 282, 288 (R.I. 1999). While a causal connection cannot be based on conjecture or speculation, we have emphasized that "proximate cause can be established by circumstantial evidence," with specific direct evidence not always being necessary. *Martinelli*, 787 A.2d at 1169 (quoting *Kurczy v. St. Joseph Veterans Association, Inc.*, 713 A.2d 766, 771 (R.I. 1998)). "'[C]ausation is proved by inference' and, although 'proof by inference need not exclude every other possible cause, it must be based on reasonable inferences drawn from the facts in evidence.'" *McLaughlin v. Moura*, 754 A.2d 95, 98 (R.I. 2000) (alterations omitted) (quoting *Skaling*, 742 A.2d at 288).

---

[9] Federico explained that the TR16 standard provides "guidance [and] general design criteria * * * to design a pump station." Specifically, it "tell[s] you what is the minimum velocity you should attain" and "suggest[s] to you the peaking factor that is necessary." Federico further stated that "[t]he standard in TR16 is if you were to have a two-foot per second velocity coming from your pump station so as to move the solids along the pipe."

Based on our review of the trial record, we are satisfied that plaintiffs presented competent evidence for the jury to infer that their purported damages were caused by the town's sewer line being connected to the Park Street line. The plaintiffs contend that the Park Plaza sewer system operated "routinely and without major incident until 1983," at which time functional problems began, coinciding "with the development of the River Drive Area by Mario aRussillo." Evidence to substantiate this position was presented at trial through Tapalian's testimony and the introduction of the LaFazia Manor plat and easement agreement, which suggested that the origin of the sewer problems can be traced back to the construction of the homes and sewer infrastructure in the River Drive area in the early 1980s.

The record also reveals that plaintiffs' witnesses testified that it would not be possible to see the check valves clogged because they are typically submerged in water. The record further reflects that testimony from Tapalian, D'Ambra, and Iascone established that, over more than a thirty-year period, they could not determine the cause of the Park Plaza sewer system's functional issues and need for frequent repairs, or how to repair the system. Federico's testimony indicated that he utilized compelling data and photographs from the Casali report, "which include[d] the Inland Waters TV inspection report," to corroborate plaintiffs' position that the buildup of grease and solids from River Drive significantly aggravated the Park Street line issues. Specifically, based upon a reasonable degree of engineering

certainty, Federico determined that the amount of flow coming from the River Drive area was 83 percent, while Park Plaza contributed 17 percent. The plaintiffs further note that evidence presented to the jury from the town's engineer and mayor substantiated Federico's conclusions.

We conclude that the trial justice did not err in finding that reasonable minds could differ on whether the town's discharge of municipal sewage into the River Drive pump station and subsequently into the Park Street line resulted in functional issues, thus causing plaintiffs' damages. Consequently, he did not err in denying the town's motion for a new trial on the issue of causation.

**4**

**Bills, General Ledgers, and Invoices**

Next, the town argues that the trial justice "erroneously admitted JEA's bills, general ledgers and invoices into evidence despite the fact that the documents simply showed general expenditures of the corporation without any further support." The town contends that the bills and invoices lack sufficient detail because they are not itemized in any way to "reflect the work actually performed or to demonstrate any relationship to the damages allegedly caused by the [t]own[,]" and plaintiffs did not present any testimony to specifically identify the work that was performed or testimony to establish that the expenditures were "necessary and reasonable to correct the actions of [the town]." The town maintains that plaintiffs only presented

evidence of Tapalian's *general* claim that the costs were associated with taking care of the pump station and Park Street line, and the witnesses that testified as to the expenditures were not experts and spoke only generally about "undocumented, undated and unsupported back-ups."

The plaintiffs counter that the town is erroneously arguing that expert testimony is a prerequisite to the admission of bills and invoices. They argue "that witnesses may testify as to the value of services rendered by themselves in a field of work in which they had some experience[.]" (Emphasis omitted.) The plaintiffs contend that in the present case, the bills, invoices, checks, and ledgers were generated by those who performed the work, and those persons testified as witnesses at trial. Moreover, plaintiffs advance the argument that Tapalian is independently "qualified to testify regarding the means, methods[,] and appropriate costs of repairing and maintaining JEA's [s]ewer [i]nfrastructure" because he had firsthand and specialized knowledge of the sewer problems, and he "is a professional engineer who holds a bachelor[']s and master's degree in civil engineering with over [fifty] years of experience in that field." Additionally, D'Ambra and Iascone, who each have over thirty years of construction experience, "particularly pertaining to sewer infrastructure[,]" provided testimony regarding the maintenance and repair work performed by them on the sewer infrastructure over the years.

It is well settled that "a bill for repairs unsupported by testimony cannot prove itself and is therefore inadmissible to prove the existence of the alleged defects or the cost of repairing them." *DeChristofaro v. Machala*, 685 A.2d 258, 268 (R.I. 1996) (quoting *Alterio v. Biltmore Constructions Corp.*, 119 R.I. 307, 311, 377 A.2d 237, 239 (1977)). The town focuses on the holding in *DeChristofaro* to support its contention that a party must present expert testimony demonstrating that the "repairs were necessary and the costs reasonable" in order for bills or invoices evidencing damages to be admissible. *Id.* The town further suggests that *DeChristofaro* stands for the proposition that, even with the foundational support by an expert, "bills must be itemized in detail."

In *DeChristofaro*, we held that "bills may be admissible * * * in circumstances in which an expert testifies that the repairs were necessary and the costs reasonable." *DeChristofaro*, 685 A.2d at 268. We highlighted that "we have upheld the admission of a repair bill that was supported by expert testimony and 'itemized in detail the repairs to plaintiff's car and the cost of each item.'" *Id.* (quoting *Krasnoff v. Flynn*, 97 R.I. 129, 131, 196 A.2d 158, 159 (1963)).

We do not read *DeChristofaro* to impose a *requirement* that expert testimony and the itemization of expenditures are required for the admission of bills. Rather, *DeChristofaro* stands for the notion that bills may not be admitted into evidence unless they are supported by reliable testimony. *DeChristofaro*, 685 A.2d at 268.

- 55 -

We agree that a bill alone does not prove itself nor prove that the costs were reasonable. However, "witnesses [are] permitted to testify as to the value of services rendered by themselves in a field of work in which they ha[ve] some experience." *Rossilli v. Iacovelli*, 88 R.I. 456, 459, 149 A.2d 709, 711 (1959).

Unlike in *DeChristofaro*, where expert testimony was offered to support the reasonableness of bills issued by third parties not testifying at trial, the invoices, bills, and general ledgers offered in the instant case were created by those who performed the work and who in turn testified at trial. Tapalian, who is a professional engineer, testified regarding maintenance and repair issues as well as to the fact that he generated the University Industries bills and hired and made the payments to all contractors and those who performed the repairs at Park Plaza.

Similarly, D'Ambra and Iascone testified regarding their decades-long experience in the maintenance of sewer infrastructures and the functional issues directly associated with the Park Street sewer system. Iascone estimated that, of the payments he received, approximately 40 percent was related to the repair work he performed. Moreover, he testified extensively as to the work he performed on the repairs to both the Park Plaza pump station and the Park Street line. He further stated that he billed JEA for the work he performed and was paid directly from JEA.

D'Ambra's testimony resembles Iascone's in that D'Ambra testified at length regarding the sewer maintenance and repair work he performed, which is reflected

in the University Industries bills. Of note, Tapalian, D'Ambra, and Iascone's respective testimony suggested that JEA's payments for the maintenance and repair of the Park Plaza sewer system were required to keep the system running properly. Accordingly, the trial justice did not abuse his discretion in allowing the admission of the bills, invoices, and general ledgers, and, consequently, he did not err in denying the town's motion for a new trial on that issue.

**5**

**FEMA Documents**

The town argues that the trial justice "erroneously admitted documents related to the relocation of the LaFazia Drive and River Drive pump stations out of the 100-year floodplains." The town underscores that it objected when plaintiffs' counsel started to ask Federico about plaintiffs' Exhibits 26 and 27, "which were part of the [t]own's documents related to the FEMA community block grant application to move the LaFazia Drive and River Drive pump stations out of the floodplain." At trial, the town questioned the relevancy of these documents and pointed out that Federico failed to include any reference to the River Drive relocation as part of his opinion testimony.

With the representation from plaintiffs' counsel that Federico was not going to use the documents to give an opinion on why the pumps in the floodplain were moved, the town did not object to the documents being introduced. The town avers

that plaintiffs ultimately did exactly what they claimed they would not do—plaintiffs argued that the relocation of the pumps was to rectify the problems with the Park Plaza pump station. The town contends that, on redirect examination of Federico, plaintiffs "sought to introduce additional documents related to the River Drive pump's relocation including the Environmental Assessment." The town objected to the introduction of the documents on the basis of relevancy, which the trial justice overruled "[b]ased on the cross." With that, the town asserts that, on cross-examination of Federico, the only time the relocation of the River Drive station out of the floodplain came up was when he was asked "if his 2013 affidavit contained his opinion in this case."

The plaintiffs counter that the trial justice properly admitted the FEMA documents into evidence because, they contend, the documents were relevant in that they were utilized by Federico in preparing for trial and in forming his expert opinions. The plaintiffs additionally contend that the town sought to impeach Federico's credibility on the basis "that he had not seen documents regarding sewage backup, high water and/or Town Pump Station failure events in the River Drive Area[,]" which allowed plaintiffs to seek "rehabilitative" testimony from Federico.

For the arguments pertaining to plaintiffs' Exhibits 26 and 27, the town did not properly preserve this issue on appeal. "According to our well-settled raise or waive rule, issues that present themselves at trial and that are not preserved by a

specific objection at trial, sufficiently focused so as to call the trial justice's attention to the basis for said objection, may not be considered on appeal." *ADP Marshall, Inc. v. Brown University*, 784 A.2d 309, 312 (R.I. 2001) (quoting *Cronan ex rel. State v. Cronan*, 774 A.2d 866, 879 (R.I. 2001)). The trial transcript reveals that, when plaintiffs moved for both Exhibits 26 and 27 to be admitted as full exhibits, the town responded that it had "[n]o objection." Although the town argues that it did not object to the admission of the exhibits based on plaintiffs' representation that Federico would not use the documents to give an opinion on why the pumps were moved, the town did not subsequently raise any objection when it believed Federico did just that. The town's failure to object has therefore resulted in a waiver of the issue.

We are additionally satisfied that the trial justice did not abuse his discretion in admitting plaintiffs' Exhibits 29 and 30. The trial justice, when considering the evidentiary issue at the hearing on the posttrial motions, made specific reference to the fact that Federico had asserted that these documents did not change his opinion. He explicitly noted that these documents, in fact, substantiated Federico's opinion.

Moreover, we view the town's argument that Federico's reliance on the documents to develop his opinion was not identified in plaintiffs' interrogatory responses to be unavailing. Rule 703 of the Rhode Island Rules of Evidence clearly states: "An expert's opinion may be based on a hypothetical question, facts or data

perceived by the expert at or before the hearing, or facts or data in evidence." That rule goes on to provide that, "[i]f of a type reasonably and customarily relied upon by experts in the particular field in forming opinions upon the subject, the underlying facts or data shall be admissible without testimony from the primary source." R.I. R. Evid. 703. In addition, we have held that a party is not entitled to the disclosure of "data or other information *considered by* the witness in forming the [witness's] opinions." *Cashman Equipment Corporation, Inc. v. Cardi Corporation, Inc.*, 139 A.3d 379, 385 (R.I. 2016) (citation omitted). Federico's own testimony indicates that these were documents he reviewed in preparation for presenting his expert testimony at trial.

We further note that the town, during its cross-examination of Federico, inquired whether he had viewed documents regarding any failure problems with the River Drive pump station, which opened the door for Federico on redirect examination to use the FEMA documents to provide clarifying testimony. The trial justice confirmed this when, at trial, he overruled the town's objection on relevance and Rule 403 grounds, stating that, "[b]ased on the cross[,]" he was going to admit Exhibit 30 as a full exhibit.

The trial justice, sitting as the "superjuror," was well within his discretion to find that the introduction of these documents did not sway the court that the "jury's finding on liability and causation did not truly respond to the merits of the case[,]"

or that it failed to do justice, as "there was certainly enough evidence along with the competing inferences in the case where reasonable minds could differ." Accordingly, we view no error in denying the motion for a new trial on this evidentiary issue.

## 6

### Remittitur

Because we have determined that the statutory cap does not apply, we now address whether a remittitur should have been granted. The town does not set out specific arguments as to why the trial justice should have remitted the verdict; rather, the town seems to incorporate its arguments as to why the motion for a new trial should not have been denied. The plaintiffs maintain that, for all the same reasons why the trial justice did not err in denying the motion for a new trial, the motion for a remittitur was properly denied by the trial justice.

In denying the remittitur, the trial justice stated that, although the jury's award may have been higher than he would have personally awarded, he did not find the amount to shock the conscience. He further noted that there was enough evidence for reasonable minds to differ as to the amount of plaintiffs' damages. While the trial justice did not engage in an expansive analysis of the town's motion for a remittitur, we do not view this as fatal, given his findings on the motion for a new trial.

Based on the parties' arguments and the trial justice's finding, we incorporate our reasoning detailed *supra* and hold that the trial justice did not err in finding that the award of $1.2 million did not appear to be excessive or to be representative of prejudice of the jury, or that it was unreasonable based on the evidence presented at trial. We therefore uphold the trial justice's denial of the motion for a remittitur.

## III

### Conclusion

For the reasons stated herein, we affirm in part and vacate in part the judgment of the Superior Court. The record in this case may be remanded to the Superior Court with instruction to reinstate the jury's verdict, and for further proceedings to determine the amount of prejudgment interest.

Justice Lynch Prata and Justice Long did not participate.

**Justice Robinson, concurring.** On the facts of this case, as they were presented at trial, I am able to concur, albeit *dubitante*.



## STATE OF RHODE ISLAND

### SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

**OPINION COVER SHEET**

| | |
|---|---|
| **Title of Case** | Johnston Equities Associates, LP, et al. v. Town of Johnston et al. |
| **Case Number** | No. 2020-150-Appeal. No. 2020-224-Appeal. (PC 11-3983) |
| **Date Opinion Filed** | July 1, 2022 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice William E. Carnes, Jr. |
| **Attorney(s) on Appeal** | For Plaintiffs: <br><br> Eric S. Brainsky, Esq. <br> For Defendants: <br><br> Kathleen M. Daniels, Esq. |